Tom PIERCE, Plaintiff–Appellant,

v.

COMMONWEALTH LIFE INSURANCE COMPANY and Capital Holding Corporation, Defendants–Appellees.

No. 93–6004.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 5, 1994.

Decided Nov. 29, 1994.

Robert J. Hollingsworth (briefed) and Katharine C. Weber (argued), Cors & Bassett, Cincinnati, OH, for plaintiff-appellant.

Michael A. Luvisi (argued and briefed) and Donna K. Perry, Brown, Todd & Heyburn, Louisville, KY, for defendants-appellees.

Before: GUY and BOGGS, Circuit Judges; and CLELAND, District Judge.*

* The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michi- gan, sitting by designation.

CLELAND, District Judge.

Appellant, who worked for appellees' insurance company as an agency manager, was found to be in violation of the company's sexual harassment policy. Appellees demoted appellant from management, decreased his pay, and transferred him to a new location. Appellant then brought this diversity action seeking damages under two state law theories, intentional infliction of emotional distress and "reverse discrimination." After discovery closed, Appellees brought a motion for summary judgment on both counts. The district court granted the motion as to each count and dismissed the case. This appeal followed. We shall affirm the judgment of the district court.

## I.

The facts of this case are not complicated and were amply set forth by the district court in a published opinion. *See Pierce v. Commonwealth Life Ins. Co.,* 825 F.Supp. 783 (E.D.Ky.1993). We summarize here: Appellant Tom Pierce ("Appellant" or "Pierce") was a supervisor of three offices for Appellees' Commonwealth Life Insurance Company and Capital Holding Corporation (collectively referred to as "Commonwealth" or "company"). Pierce had been employed by Commonwealth in various positions since August of 1958. From April, 1983 to March, 1991, Pierce held the position of Agency Manager of The Wabash Valley Agency in Kokomo, Indiana. During his tenure as Agency Manager, Pierce supervised three offices located in Indiana.

In early March of 1991 an office administrator in one of the offices, Debbie Kennedy, complained of sexually inappropriate behavior by Pierce, directing her protest to Peggy Erhart, who was employed in the company's human resources department. Specifically, Kennedy complained about receiving a card from Pierce reading, "Sex is a misdemeanor. De more I miss, de meanor I get." In addition, Kennedy claimed Pierce gave her a cartoon valentine which stated, "There are many ways to say 'I love you' ... but f____ing is the fastest." Kennedy also protested about her most recent evaluation and merit increase.

Erhart relayed the above information to John Balser, the company's field vice president. On March 6, 1991, Erhart and Balser met with Pierce and accused him of sexually harassing two female employees, Kennedy and Deena Shaffer.[1] According to Pierce, Erhart and Balser refused to explain the specific allegations of sexual harassment, but instead demanded that Pierce himself describe what he had done to offend the two employees. In response, Pierce described the same two incidents outlined above relating to himself and Kennedy. Pierce emphatically maintained, however, that these isolated incidents did not amount to sexual harassment because Kennedy was a willing participant in the conduct. Indeed, Pierce indicated that Kennedy's behavior was often off-color and even more flagrant than Pierce's.[2] For example, Kennedy gave Pierce a sexually-oriented cartoon in response to his off-color valentine; she engaged in flirtatious behavior; she commented to Pierce, "If I became horizontal and spread my legs, I might get a better evaluation"; she brought in a "joke" apron which had suspended from it a fabric phallus and a printed message: "where's the beef?"; she sent and shared sexually explicit jokes and cartoons with other employees; and she brought a pornographic videotape into the office. *See id.* at 785.

Pierce again met with Erhart and Balser the next day (March 7, 1991). Pierce alleges that at this meeting Erhart and Balser were evasive and that Balser commented that Pierce might as well have been a "murderer, rapist or child molester, that it wouldn't be any worse."

Based upon its investigation and Pierce's own admissions, the company found Pierce in violation of its sexual harassment policy.[3]

---

1. Shaffer was the Office Administrator of one of the other offices managed by Pierce.

2. Others said essentially the same thing about Kennedy.

3. The company's sexual harassment policy states in pertinent part:
 Employees are expected to conduct themselves in accordance with Capital Holding Agency Group's equal employment opportunity policy.

Pierce was subsequently demoted from agency manager to the position of insurance representative; his pay was reduced by approximately $250 per week; and he was transferred to an office in Kentucky, which increased his commuting time. In addition, Pierce's personal belongings from the office were dropped off to him at a "Hardee's" roadside fast food restaurant. When Pierce later confronted Balser over the telephone about the specifics of the allegations, Balser allegedly replied, "if Debbie [Kennedy] had pulled her pants down and you would have looked, you were just as guilty" and "you don't have to get your hand wet to be guilty." Finally, on May 22, 1991, Pierce, for the first time, received a formal statement as to the reasons for Commonwealth's actions. In that statement, counsel for the company alleged that Pierce had been counseled by other managers in regard to complaints filed by a female customer and office administrators on two occasions during the past ten years. Pierce denies that any past harassment or counseling ever took place. Contrasted to the punishment meted out to Pierce, it is undisputed that the company took no disciplinary action against Kennedy.

Pierce filed the instant diversity suit alleging the following state law claims: (1) "reverse discrimination" and (2) intentional infliction of emotional distress. The district court granted the company's motion for summary judgment on both counts. Pierce appeals that decision.

## II.

■ This court reviews grants of summary judgment *de novo* and it applies the same test utilized by the district court. *EEOC v. University of Detroit*, 904 F.2d 331, 334 (6th Cir.1990). The applicable standard for motions for summary judgment is well settled. To grant a motion for summary judgment, the court must find that the pleadings, together with the depositions, interrogatories and affidavits on file, establish that there is no genuine issue of material fact and

that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. A party seeking summary judgment bears the initial burdens of specifying the basis upon which it contends judgment should be granted and of identifying that portion of the record which, in its opinion, demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Thus, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554. The nonmoving party must thereafter produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

■ Although a plaintiff is entitled to a review of the evidence in the light most favorable to him or her, the nonmoving party is required to do more than simply show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The Rule requires the nonmoving party to come forward with "specific facts showing that there is a *genuine* issue for trial." Fed.R.Civ.P. 56(e) (emphasis added); *see also United States v. WRW Corp.*, 986 F.2d 138, 143 (6th Cir.1993) (court not required to speculate as to what portion of record nonmoving party relies upon, nor is there an obligation for it to "wade through" the record for specific facts). Furthermore, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

## III.

■ The first issue this court must consider is whether the district court erred in

---

Acts of discrimination by supervisors or co-workers, including but not limited to, sexual, racial, or other unlawful harassment, are strictly prohibited and may result in disciplinary action up to and including termination.

With regard to sexual harassment, ... [e]mployees including both supervisory and non-supervisory personnel are prohibited from engaging in unwelcome sexual conduct or making unwelcome sexual overtures.

dismissing Pierce's claim of "reverse discrimination." Pierce contends that if he violated the company's sexual harassment policy then so, certainly, did Kennedy; yet, the company took adverse action solely against Pierce. Thus, claims Pierce, he suffered impermissible discrimination pursuant to Kentucky's version of Title VII [4], found at Ky.Rev.Stat. Ann. ("K.R.S.") § 344.040 [5], by being treated differently than Kennedy, a female employee. Because this case is based on diversity jurisdiction the district court correctly ruled that Kentucky law applies to the state law claims. *See, Erie R. R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

■ This disparate treatment case is subject to the following tripartite analysis, with the burden of proof remaining with Pierce at all times:

(1) the plaintiff must establish a prima facie case of discrimination, (2) the employer must offer evidence of a legitimate, nondiscriminatory reason for its actions, and (3) the plaintiff must prove that the reason offered is in fact a pretext for intentional discrimination.

*Kent County Sheriff's Ass'n v. County of Kent*, 826 F.2d 1485, 1492 (6th Cir.1987) (*citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801, 93 S.Ct. 1817, 1823–24, 36 L.Ed.2d 668 (1973)).

**4.** Title VII of the 1964 Civil Rights Act provides in pertinent part:

(a) Employer practices. It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
(2) to limit, segregate or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
42 U.S.C. § 2000e–2(a).

**5.** K.R.S. § 344.040 makes it unlawful for an employer:

(1) To fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against

■ In *McDonnell Douglas*, the Court set forth the general elements required for a plaintiff to prove a prima facie case: (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.[6] *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. Consistent with the Supreme Court's admonition that the above standard should be modified to accommodate different employment discrimination contexts, *id.* at 802 n. 13, 93 S.Ct. at 1824 n. 13, this court has adopted the following test in cases, such as the instant one, involving claims of so-called "reverse discrimination":

[A] prima facie case of "reverse discrimination" is established upon a showing [1] that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority," [7] *Parker v. Baltimore and Ohio Railroad Co.*, 652 F.2d at 1017, *see also Daye v. Harris*, 655 F.2d 258 (D.C.Cir. 1981); and upon a showing [2] that the employer treated differently employees who were similarly situated but not members of the protected class.

an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's ... sex....

**6.** Because Pierce alleges no direct evidence of discrimination, the inferential test propounded by the Supreme Court in *McDonnell Douglas* applies. *See International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335, n. 15, 97 S.Ct. 1843, 1854, n. 15, 52 L.Ed.2d 396 (1977).

**7.** The first prong of this test has been criticized by some courts as impermissibly imposing a "heightened standard" upon reverse discrimination plaintiffs. *See Ulrich v. Exxon Co.*, 824 F.Supp. 677, 683–84 (S.D.Tex.1993) (and cases cited therein). We have serious misgivings about the soundness of a test which imposes a more onerous standard for plaintiffs who are white or male than for their non-white or female counterparts. However, our doubts concerning this issue do not affect the disposition of the case since Pierce cannot meet the second required prong of his prima facie case.

Murray v. Thistledown Racing Club, Inc., 770 F.2d 63, 67 (6th Cir.1985) (citation omitted); see also Jasany v. United States Postal Service, 755 F.2d 1244, 1252 (6th Cir.1985); Boger v. Wayne County, 950 F.2d 316, 325 (6th Cir.1991); Ruth v. Children's Medical Center, 940 F.2d 662 (Table), 1991 WL 151158, at * 6 (6th Cir. Aug. 8, 1991).

■ Pierce claims that he has demonstrated a prima facie case of reverse sex discrimination under K.R.S. § 344.040[8] in that he was disciplined—demoted in rank and pay—for off-color conduct while Kennedy, a similarly-situated female employee, was not disciplined at all despite engaging in more egregious conduct. The parties do not dispute the test (but dispute, of course, its application) for determining whether a proposed comparable is, in fact, similarly situated:

> In order for two or more employees to be considered similarly-situated for the purpose of creating an inference of disparate treatment in a Title VII case, the plaintiff must prove that all of the relevant aspects of his employment situation are "nearly identical" to those of the [female] employees who he alleges were treated more favorably. The similarity between the compared employees must exist in all relevant aspects of their respective employment circumstances.

Ruth v. Children's Medical Center, 940 F.2d 662 (Table), 1991 WL 151158, at * 6 (6th Cir. Aug. 8, 1991) (quoting Payne v. Illinois Central Gulf R.R., 665 F.Supp. 1308, 1333 (W.D. Tenn.1987)); see also Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir.1992) (holding that, in order to be deemed "similarly-situated," the plaintiff must show that the comparables ". . . are similarly-situated in all respects") (citing Stotts v. Memphis Fire Dept., 858 F.2d 289 (6th Cir.1988)).

Commonwealth argues, and the district court held, that the company's treatment (or forbearance) relative to Kennedy could not be compared to its treatment of Pierce be-cause the two were not "similarly-situated" employees. Pierce, 825 F.Supp. at 787. The court relied on the undisputed facts that, unlike Kennedy, Pierce was a member of management, had authority over three offices and several subordinates, and had a responsibility to maintain a respectful, respectable, and decorous office. Id.

Pierce argues that the district court erred in considering the fact that he was a supervisor and Kennedy was not. It is undisputed that the company's policy against sexual harassment applies expressly to both supervisory and non-supervisory personnel. Therefore, according to Pierce, "the distinction between supervisory and non-supervisory personnel is absolutely irrelevant." We disagree.

■ In order to show that he was "similarly situated" to Kennedy, Pierce was required to prove that all of the relevant aspects of his employment situation were "nearly identical" to those of Kennedy's employment situation. Ruth v. Children's Medical Center, 940 F.2d 662 (Table), 1991 WL 151158, at * 6 (6th Cir. Aug. 8, 1991). The following distinctions between Pierce and Kennedy are undisputed: Pierce was a supervisor and Kennedy was not; Pierce had responsibility over three offices, whereas Kennedy was an "office administrator" with no supervisory control over any other employees; Pierce evaluated employees, including Kennedy, while Kennedy evaluated no one; and, unlike Kennedy, Pierce attended agency group meetings and was responsible for enforcement of the company's sexual harassment policy.

Pierce's unsupported argument—that the distinction in employment status between himself and Kennedy is somehow "irrelevant"—is without merit for the following reason: the company's ultimate liability for a violation of Title VII (or its Kentucky counterpart) could very well depend on which of these two employees violated its sexual harassment policy, and ultimately the law.[9]

---

**8.** Kentucky courts apply the McDonnell Douglas framework to discrimination cases brought under state law. See, e.g., Kentucky Ctr. for the Arts v. Handley, 827 S.W.2d 697, 699 (Ky.Ct.App. 1991).

**9.** The language contained within the company's sexual harassment policy, footnote 3, supra, is reproduced almost verbatim from Supreme Court precedent interpreting Title VII. See Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57,

Title VII, like Kentucky's counterpart, prohibits "employers" from discriminating against individuals on the basis of certain statutorily prohibited reasons (*e.g.*, race, gender). *See* 42 U.S.C. § 2000e–2(a); K.R.S. § 344.040(1). Under Title VII, an "employer" is defined as "a person engaged in an industry affecting commerce ..., *and any agent of such person.*" 42 U.S.C. § 2000e(b) (emphasis added); *see also* K.R.S. § 344.040(1). The term "agent" is not defined by Title VII, but has been interpreted by courts as an individual who "serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment." *Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir. 1993) (*quoting Paroline v. Unisys Corp.*, 879 F.2d 100, 104 (4th Cir.1989), *aff'd in pertinent part*, 900 F.2d 27 (4th Cir.1990) (en banc)); *see also York v. Tennessee Crushed Stone Ass'n*, 684 F.2d 360, 362 (6th Cir.1982).

 In supervisor sexual harassment cases, an individual who is acting as an employer's "agent" is deemed the alter ego of the employer and the employer is liable for his unlawful employment practices without regard to whether the employer actually knew (or should have known) of the individual's conduct. *Kauffman v. Allied Signal, Inc., Autolite Div.*, 970 F.2d 178, 183 (6th Cir.1992) (holding that the "knew or should

have known" standard does not apply to supervisor harassment cases. In a hostile working environment claim, the determination of whether an employer is liable for its supervisor's actions depends on 1) whether the supervisor's harassing actions were foreseeable or fell within the scope of his employment and 2) even if they were, whether the employer responded adequately and effectively to negate liability. Where the complaint alleges "quid pro quo" harassment, in which a supervisor demands sexual favors as a condition for job benefits, the employer is strictly liable under a respondeat superior theory), *cert. denied*, —— U.S. ——, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992); *see also* 29 C.F.R. § 1604.11(c) ("Applying general title VII principles, an employer ... is responsible for its acts and those of its agents and supervisory employees with respect to sexual harassment regardless of whether the specific acts complained of were authorized or even forbidden by the employer and regardless of whether the employer knew or would have known of their occurrence").[10]

 The standard for determining an employer's liability in co-worker discrimination cases is markedly different from the standard applied in supervisor harassment cases. In order to establish employer liability in a co-worker discrimination case the plaintiff must assert and prove the existence

65–66, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986) (holding "that a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive working environment").

**10.** We note that the rule propounded by this circuit in *Kauffman* amplifies the language found in 29 C.F.R. § 1604.11(c) and, in addition, allows for the negation of an employer's liability regarding supervisors if the employer responds "adequately and effectively" to the harassment. *Id.* at 184. This development was foreshadowed by *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), a "hostile work environment" case, where the Supreme Court, though announcing no definitive rule on employer liability, noted that employers are not "always automatically liable for sexual harassment [committed] by their supervisors." *Id.* at 72, 106 S.Ct. at 2408. Applying general principles of agency, the *Vinson* Court further stated, however, that "absence of notice to an employer does not necessarily insulate that employer from liability." *Id.*

Not all courts read *Vinson* as affording employers an opportunity to avoid liability by effectively responding to the sexual harassment actions of their supervisors. *See, e.g., Karibian v. Columbia University*, 14 F.3d 773, 780 (2d Cir. 1994) (employer absolutely liable—regardless of notice or reasonableness of complaint procedures—if supervisor uses actual or apparent authority to further harassment; however, where low-level supervisor does not rely on his authority the situation is to be treated like co-worker harassment), *cert. denied*, —— U.S. ——, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994); *Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir.1993) (applying 29 C.F.R. § 1604.11(c)); *Vance v. Southern Bell Tel. and Tel. Co.*, 863 F.2d 1503, 1512 (11th Cir.1989); *Levendos v. Stern Entertainment, Inc.*, 909 F.2d 747, 752 (3rd Cir.1990).

Any distinction between *Kauffman* and 29 C.F.R. § 1604.11(c) poses no difficulty in this case because, under either standard, Pierce is not similarly situated to Kennedy.

of what has been characterized as "responde-at superior" liability. *Rabidue v. Osceola Refining Co.,* 805 F.2d 611, 619–20 (6th Cir. 1986), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987); *see also Kauffman,* 970 F.2d at 183. Under this theory, "an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action." 29 C.F.R. § 1604.11(d); *see also Rabidue,* 805 F.2d at 621 (to show respondeat superior liability, plaintiff must prove "that the employer, through its agents or supervisory personnel, knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action"); *Kauffman,* 970 F.2d at 183.[11]

▆ We hold that, in a sexual harassment context, the harasser's title and/or job responsibilities could be considered a "relevant aspect of his employment situation." *See Ruth v. Children's Medical Center,* 940 F.2d 662 (Table), 1991 WL 151158, at * 6 (6th Cir. Aug. 8, 1991). If Commonwealth were to allow Pierce—who would very likely be considered its "agent" under Title VII—to continue as supervisor, it faced the risk that he might again violate its sexual harassment policy, though without its specific knowledge. Because of the complaints by Kennedy, Commonwealth could be liable for such a future incident, irrespective of whether it knew or should have known about it. *See Kauffman,* 970 F.2d at 184; 29 C.F.R. § 1604.11(c). Conversely, any violation committed by Kennedy—a non-agent under any definition—would generate liability to Commonwealth *only* if it knew or should have known about it *and* failed to take remedial action. *See Kauffman,* 970 F.2d at 183; 29 C.F.R. § 1604.11(d). Thus, unlike the case of supervisor Pierce, the company would have the opportunity to assess and remedy any sexual harassment complaints lodged against non-supervisor Kennedy before incurring liability. Under these circumstances, the relevant as-

pects of his employment are not, as Pierce claims, "nearly identical" to Kennedy's employment. Thus Pierce and Kennedy are not "similarly-situated" employees. Because Pierce has presented no other evidence of disparate treatment of employees who are truly similarly situated, he has failed to satisfy the elements of his prima facie case. Accordingly, summary judgment was proper on Pierce's claim for reverse discrimination.

▆ Even assuming, *arguendo,* that Pierce could establish a prima facie case, the district court was correct in determining that summary judgment in favor of Commonwealth was proper on the basis that Pierce offered no evidence that Commonwealth's proffered, non-discriminatory justification for demoting Pierce was a pretext for discrimination. Because Commonwealth articulated a legitimate non-discriminatory reason for the demotion—an admitted violation by Pierce, who was a supervisor, of Commonwealth's sexual harassment policy—Pierce was required, in order to withstand summary judgment, to establish that the proffered reason was pretextual. *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 584 (6th Cir.1992). Further, as the Supreme Court recently stated, establishing that the employer's reason was a pretext requires that a plaintiff do more than simply impugn the legitimacy of the asserted justification; in addition, the plaintiff must also adduce evidence of the employer's discriminatory animus:

> [N]othing in law would permit us to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and lesser) finding that the employer's explanation of its action was not believable.

*St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2751, 125 L.Ed.2d 407 (1993). The Court went on to rule that:

> [A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown

---

11. The term "respondeat superior"—which connotes derivative liability—is an incorrect label for co-worker harassment cases, where the employer is directly liable for its own negligence. *See*

*Hirschfeld v. New Mexico Corrections Dept.,* 916 F.2d 572, 577, n. 5 (10th Cir.1990) (and cases cited therein).

*both* that the reason was false, *and* that discrimination was the real reason. *Id.* at ——, 113 S.Ct. at 2752.

In his attempt to show that Commonwealth's proffered reason was pretextual, the only fact noted by Pierce was that Commonwealth "took absolutely no action against Kennedy." As discussed above, however, Pierce and Kennedy were not similarly situated in all relevant respects. Accordingly, she is not a proper "comparable." *Mitchell,* 964 F.2d at 583. Pierce has provided no evidence which could show, directly or indirectly, that Commonwealth's proffered explanation for Pierce's demotion was a pretext for discrimination. On the contrary, the evidence shows that Pierce was transferred for only one reason: he admitted to participating in actions which were not only inappropriate for him as a manager, but which violated Commonwealth's sexual harassment policy and also potentially exposed the company to liability. Consequently, even if Pierce had established a prima facie case, summary judgment in favor of Commonwealth was proper because Pierce failed to present evidence that raised a triable issue of fact concerning the issue of pretext. *Ruth v. Children's Medical Center,* 940 F.2d 662 (Table), 1991 WL 151158, at * 6 (6th Cir. Aug. 8, 1991) *(citing Steckl v. Motorola, Inc.,* 703 F.2d 392, 393 (9th Cir.1983)) ("summary judgment appropriate where plaintiff fails to produce evidence that raises a triable issue of fact concerning pretext"); *see also EEOC v. MCI Int'l,* 829 F.Supp. 1438, 1451 (D.N.J. 1993) ("while *[St. Mary's Honor Center v.] Hicks,* of course, was not a summary judgment case, its principles can be incorporated into the well-understood summary judgment standard").

For the aforementioned reasons, the district court's ruling on Pierce's "reverse discrimination" claim is affirmed.

### IV.

The second issue this court considers is whether the district court erred in dismissing Pierce's claim, under Kentucky law, of intentional infliction of emotional distress. Like most other states, Kentucky recognizes a cause of action for the intentional infliction of emotional distress arising from extreme and outrageous conduct. In *Craft v. Rice,* 671 S.W.2d 247, 250–51 (Ky.1984), the Kentucky Supreme Court adopted the definition of the tort of outrageous conduct as set forth in the *Restatement (Second) of Torts* § 46 (1965), which states:

> § 46. Outrageous Conduct Causing Severe Emotional Distress
>
> (1) One who *by extreme and outrageous conduct* intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm results to the other from it, for such bodily harm.

*Id.* (emphasis added). Comment h to that section sets forth the procedural standards to be applied by the court to determine whether conduct is "extreme and outrageous":

> h. *Court and jury.*
>
> It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.

In turn, Comment d to § 46 of the Restatement provides the following definition:

> d. *Extreme and outrageous conduct.*
>
> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. *Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.* Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outra-

geous!" The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities....

*Id.* (emphasis added). Kentucky courts have explicitly adopted this definition. *See, e.g., Craft,* 671 S.W.2d at 250; *Humana of Kentucky, Inc. v. Seitz,* 796 S.W.2d 1, 3 (Ky. 1990).

■■■ Here, the conduct which Pierce claims was "outrageous" can be broken down as follows:

(1) Without any evidentiary support, Commonwealth officials accused Pierce of engaging in and tolerating sexual harassment during a ten-year period and falsely alleged that Pierce had been counseled for such misconduct;

(2) Balser and Erhart (Commonwealth officials investigating the incident) were "vague and evasive" in their private meetings with Pierce;

(3) Balser made the following statements to Pierce:

(a) that Pierce "might as well have been a murderer, rapist, or child molester, it wouldn't be any worse"

(b) "if Debbie [Kennedy] pulled her pants down and you would have looked, you were just as guilty"

(c) "you don't have to get your hand wet to be guilty"

(4) Pierce's personal belongings were dropped off to him at a roadside Hardee's restaurant.

It is conceivable that the alleged false statements regarding Pierce's behavior during years past and his "counseling" by others may have been tortious. The crude statements Pierce alleges in (3), comparing his actions to the perpetration of heinous crimes, certainly could be characterized as "indignities" which were "insulting." The same can be said about the manner of delivery of the personal belongings of this man who had dedicated more than thirty years to Commonwealth.

We recognize that a reasonable juror could well conclude, consistent with Pierce's allegations, that Commonwealth's conduct was utterly careless and that the terms used to express the conclusions of the "investigators" were decidedly vulgar. The jury could agree that the investigation was, in Pierce's terms, "a fiasco [which] resembled a Keystone cop [sic] performance." The imagery is interesting, but diminishes the power of Pierce's assertion: the Keystone Kops, though they were bumbling fools fully capable of perpetrating annoyances and insults, did not exhibit the kind of atrocious behavior which could be said to exceed civilized bounds of decency. Pierce's claims concerning what he might think of as the "Commonwealth Cops" must submit to an equivalent observation. The *outrageous* behavior required under the Restatement and by Kentucky law is found neither in those old Mack Sennett comedies nor within the facts of this case, which fall far short of the mark required for a claim of intentional infliction of emotional distress. *See, e.g., Roush v. KFC National Management Co.,* 10 F.3d 392, 401 (6th Cir.1993) (claim of outrage fails as a matter of law although discharged elderly employee was, among other things, subjected to derogatory remarks about her age, forced to eat lunch by herself and required to walk repeatedly to the supply room despite suffering from arthritis); *see also Humana of Kentucky, Inc. v. Seitz,* 796 S.W.2d 1, 3 (Ky.1990).

We hold here, as we did in *Roush* that, under Kentucky's stringent standards, no reasonable juror could conclude that the company's actions were so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Accordingly, the district court properly dismissed Pierce's claim of intentional infliction of emotional distress pursuant to Fed.R.Civ.P. 56(c).

**AFFIRMED.**