**Judith FRANULIC and Ivo Franulic, Plaintiffs–Appellants,**

v.

**BOZELL WORLDWIDE, INC., Defendant–Appellee,**

No. 00–1476.

United States Court of Appeals, Sixth Circuit.

Dec. 21, 2001.

**512**

Before JONES and CLAY, Circuit Judges; and DOWD, Senior District Judge.[*]

DOWD, Senior District Judge.

Plaintiff–Appellant Judith Franulic ("Franulic") appeals from the district court's order granting summary judgment in favor of defendant Bozell Worldwide, Inc. ("Bozell") on her Title VII claim of sex discrimination in employment. For the following reasons, we REVERSE the district court's ruling and REMAND for further proceedings consistent with this opinion.

## BACKGROUND

On March 9, 1999, Judith and Ivo Franulic filed their two-count complaint in the United States District Court for the Eastern District of Michigan against Judith Franulic's employer, Bozell Worldwide, Inc.[1] The complaint, brought under Title VII and Michigan's Elliott–Larsen Civil Rights Act,[2] alleged that Franulic was dis-

criminated against on the basis of sex[3] when her employment with Bozell was terminated.[4]

Franulic was first employed by Bozell's corporate predecessor, Saatchi and Saatchi, in 1986 as a secretary. She has a bachelors degree in Sociology from Wayne State University and has taken several courses in marketing. She and Ivo have been married over 30 years; they have two adult children, one of whom is still financially dependent on them. In 1994, Ivo, a longtime employee of Unisys, was permanently laid off, leaving Franulic as the family's sole source of income. Ivo has opened a dry cleaning establishment, which Franulic contends has yet to show a profit.

From 1986 through 1994, Franulic's employer went through several corporate acquisitions and mergers while continuing to serve essentially the same clients. Bozell took ownership in January 1994. The primary business of Bozell's Detroit office was providing advertising services for automotive clients. Its largest client was Chrysler, which accounted for about 95% of its business.

During her career, Franulic was promoted through several positions: Administrative Assistant, New Business Coordinator, Account Manager, Account Executive, Senior Account Executive, and Account Supervisor. On or about April 25, 1996,

[*] The Honorable David D. Dowd, Jr., Senior United States District Judge for the Northern District of Ohio, sitting by designation.

1. On March 17, 1998, Franulic had filed an EEOC charge of sex and age discrimination; on December 9, 1998, the EEOC issued her a right to sue letter.

2. 42 U.S.C. § 2000e, *et seq.*; Mich.Comp. Laws § 37.2101, *et seq.* The analysis for both claims is identical. *See Pomranky v. Zack Co.,* 159 Mich.App. 338, 405 N.W.2d 881, 883–84 (1987).

3. At the time of her termination, Franulic was 49 years old. The complaint initially alleged age discrimination in addition to sex discrimination; however, the age claim was voluntarily dismissed with prejudice.

4. Franulic's husband, plaintiff-appellant Ivo Franulic, also asserted a loss of consortium claim. For simplicity, since any loss of consortium claim is derivative of the underlying sex discrimination claim, in this opinion, references to the plaintiffs-appellants will be in the singular.

she was made a partner in Bozell's Multi–Products Group (hereafter, "the Group"),[5] which accounted for about 5% of the office's revenue and serviced only non-automotive accounts. At all times during her tenure of employment Franulic performed competently; she was the recipient of commendations from her superiors and her employer's clients.

On November 6, 1997, Franulic's employment with Bozell was terminated, purportedly due to a reduction in force ("RIF") aimed at improving efficiencies and cutting costs. At the time, Franulic's annual salary was $69,000. After the termination of her employment, she and Ivo were forced to declare Chapter 7 bankruptcy.[6]

Bozell asserts that, after July 31, 1997, when True North Communications ("True North") announced its pending merger with Bozell's parent company, Bozell, Jacobs, Kenyon & Eckhardt, Inc. ("BJK & E"), Bozell's senior management decided to cut expenses and increase revenues in order to achieve the financial results promised to True North. On September 19, 1997, the president of BJK & E sent a memo to all Bozell general managers announcing a company-wide hiring and salary freeze, the closing of all open positions, and the discontinuation of temporary freelance help. Later, at an off-site meeting, the Detroit department heads were informed that a reduction in force would also be necessary. The determination of which employees to eliminate in the RIF was purportedly based on profitability and performance, which included a consideration of those employees who were believed to be low-performing or under-performing.

Each Detroit department head was asked to review operations and staffing, and to RIF wherever possible to cut costs and enhance profitability. All managers were asked to submit lists of candidates for termination by mid-October, 1997. Robert Elliott, head of the Group (and Franulic's supervisor) selected Franulic and Frank Blaney for the RIF. Elliott claims to have chosen Franulic because she was not essential to the operations of the Multi–Products Group. Frank Blaney was chosen because he handled only pro bono accounts.[7]

At the time of her termination, Franulic was the account supervisor of the Consumers Energy ("CE") account. Bozell's arrangement with CE called for CE to pay a fixed fee of $300,000 annually, irrespective of the account's level of activity.[8] Elliott claims that, at the time he included Fran-

---

5. Franulic was recommended for the promotion by her then-supervisor Scott Thornton. The promotion was approved by the CEO of the Detroit Office, Michael Vogel.

6. The question of Franulic's standing to bring this action was raised at oral argument where counsel represented that he had been retained by the trustee in bankruptcy to prosecute the claim on behalf of the estate.

7. Elliott's suggestion to terminate Frank Blaney's employment was subsequently rejected by CEO Mike Vogel. Although Blaney was making $96,000 (as compared to Franulic's $69,000) and had little recent experience in account management, Vogel decided to retain Blaney because he was ill and Vogel did not think a layoff would be "the right thing to do." (J.A. at 341). Blaney ultimately retired on his own in June 1998, although the particular timing of his retirement afforded him no additional advantage.

8. This was apparently a "transitional time" for CE as utilities in Michigan were undergoing deregulation. CE had not yet decided on a marketing strategy. Rather than spending large amounts on advertising without clear marketing goals, CE decided on the fixed fee arrangement with Bozell. In September 1997, CE's evaluation of Bozell's services included all "very good" and "excellent" ratings for the account manager, that is, Franulic.

ulic's name on the RIF list, she "was not essential to the operations of the Multi-Products Group, . . .[and] was spending approximately 50% of her time on [CE], 10% helping out on pro bono accounts (which were not income generating), and approximately 40% of her time assisting [Elliott] (and others) with miscellaneous, non-income generating administrative projects." (J.A. at 116). He asserted that "it was logical and least disruptive to the department to eliminate her position and arrange for another employee to oversee her account (in addition to the employee's other assignments)." *Id.*[9]

Franulic acknowledges that the CE account did not always involve full time work and she claims to have repeatedly requested additional account work. Bozell's response was to assign her to two pro bono accounts. Franulic also claims that she asked to be considered for the position of Director of New Business, a position that had been open since 1996 when the previous director was assigned overseas. Although she had served as a staff person to the New Business Manager for two years and had been trained in the Saatchi and Saatchi "canal system" of attracting new business, her request was ignored by managing partner Rob Elliott.[10]

Rob Elliott, who became managing partner of the Group in January 1997, had worked at Little Caesar's in Detroit for over 17 years, with his last position being Vice President of Marketing. While there, he had worked with Chris Elliott (no relation), who eventually came to Bozell to head up the Creative Section of the Group, and with his friend David Church, who became Bozell's Director of New Business. Franulic claims that, in contrast to prior managing partners, Rob Elliott treated her in a cold and distant manner from the time of his arrival until he terminated her.

Franulic claims that, after her termination, the CE account was taken over by David Church, a 35-year-old male who, at the time, had not been servicing any accounts and had been hired just two months earlier. Church was hired in September 1997 as Director of New Business,[11] despite the fact that he had virtually no prior advertising agency experience, having spent his career in corporate marketing departments buying media, and despite the fact that the only available job description for New Business Director called for "solid agency experience" and "account experience." (J.A. at 310).[12] Church's annu-

---

**9.** Elliott also claims that he received information from other members of the Group that Franulic had difficulty dealing with the creative staff. Donald DeFilippo, the Associate Creative Director of the Detroit Office, testified at his deposition that Doug Blanchard, another member of Creative, felt Franulic was "one of the worst Account Executives that [the creative department] had ever known." (J.A. at 521–22). Aside from the fact that this testimony was hearsay, it is belied by all the commendations Franulic received from supervisors and by the high marks and praise from her clients. Even Chris Elliott admitted that his department (Creative) "complains about anybody, anywhere, anytime." (J.A. at 330).

**10.** Elliott claimed that he had not considered Franulic for the Director of New Business position because, even though he had never looked at her personnel file and was not aware of her prior experience, he did not believe her "skill set" was appropriate for the position. (J.A. at 339).

**11.** Apparently, Church was hired right about the time a hiring freeze had been announced. An offer for the job of Director of New Business was made by letter dated September 18, 1997, just one day before the announced hiring freeze. Rob Elliott had wanted to offer immediate senior partner status to Church but was restrained by Vogel.

**12.** Although this job description is dated July 1998, long after the events surrounding Fran-

al salary was $115,000, in contrast to Franulic's $69,000. Church was later removed as Director of New Business because of a *lack* of new business, a situation which Chris Elliott, head of Creative for the Group, attributed to Church's lack of "deep contacts as a seasoned New Business person would [possess] . . . ." (J.A. at 329). Church was also removed from his position as account supervisor of the CE account (which Franulic had managed prior to her termination) after Terry Mierzwa, CE's Director of Marketing, complained about Church's inability to meet deadlines and his failure to keep CE informed regarding the status of projects. Church was never made a partner.

Franulic asserts that she was the only person in her division to be terminated and that she was picked for termination because of her gender. She asserts that, unlike Frank Blaney who was also picked but ultimately not terminated because he was ill, no one ever gave any consideration to *her* personal hardship, i.e., that she was the sole wage-earner for her family. She also asserts that Kevin Brown, a male partner in the Group was not nominated for layoff even though, as of October 1997, he was assigned no accounts. She claims that his Group Management Supervisor position was created for him in 1994 and discontinued after November 5, 1997 when, without warning, he resigned. At the time of the RIF, Brown was earning $160,000.

Another partner in the Group who was not chosen for layoff was Ken Ciesielski. He was retained even though he admittedly had problems with the Air Touch account (previously known as Cellular One), an account with which Franulic had years of intensive involvement which had earned her several commendations. Franulic was never offered assignment to that account in lieu of layoff.[13]

Franulic argues that there was a corporate climate of discrimination against women. As support for this, she points to a skit given by "Defendant's hierarchy" (Appellant's Brief at 19), which took place on October 9, 1996, a little over a year before her termination. It occurred at a general agency meeting attended by all employees in the Detroit office. It lasted over an hour and was, according to Franulic, filled with offensive references and activity.[14] During the skit, CEO Vogel said that anyone who was offended could go to "Helen Wayte" in Human Resources. Several women employees apparently *did* complain to Human Resources. Vogel responded to the complaints by destroying copies of the videotape of the skit and retaining only the master tape.

---

ulic's claims, it does suggest what Bozell thought was important for performance of the job.

**13.** At the time of the layoff, the Air Touch account had approximately 250 advertising projects ongoing.

**14.** In her brief, Franulic states that the skit participants were David Bell, New York corporate CEO of Bozell Worldwide; Leo Kelmenson, Chairman of Bozell Worldwide; Tom Bernardine, supervisor of international activities; Gary Topolewski, Executive Vice President and Chief Creative Officer for Bozell Detroit; Jane Mendenhall, Vice President of Studio and Traffic; and several lesser ranking employees, including Frank Blaney.

The skit had a criminal courtroom theme, Franulic claims that there were repeated references to "conjugal visits" with Mendenhall; remarks about the jury being "hung" and "stacked;" and many other phrases with double meaning. *See* Appellant's Brief at 20. She claims that participants in the skit were dressed provocatively; that Mendenhall did a "bump and grind" while four men in boxer shorts danced with her; and that comment was made about Mendenhall's large bosom being used as pillows for two of the executives.

On November 1, 1997, of sixteen managing partners in the area of account supervision, one was female. These managing partners all reported to Michael Vogel.

## ANALYSIS

This Court reviews *de novo* the district court's order granting summary judgment. *Johnson v. Econ. Dev. Corp.*, 241 F.3d 501, 509 (6th Cir.2001); *E.E.O.C. v. Prevo's Family Market, Inc.*, 135 F.3d 1089, 1093 (6th Cir.1998). An entry of summary judgment can be upheld only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When reviewing a motion for summary judgment, we must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir.2000). If the moving party meets its burden of production, the non-moving party must produce more than a mere scintilla of evidence to survive summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ To establish her claim of discriminatory termination in the context of a reduction in force, Franulic was required to show: (1) membership in a protected class, (2) qualification for her job, (3) adverse employment action, and (4) "additional direct, circumstantial or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir.1998) (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir.), *cert. denied*, 498 U.S. 878, 111 S.Ct. 211, 112 L.Ed.2d 171 (1990)). "A plaintiff satisfies the fourth prong where he or she demonstrates that a 'comparable non-protected person was treated better.'" *Ercegovich*, 154 F.3d at 350 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582–83 (6th Cir.1992)).

The district court granted summary judgment in favor of Bozell concluding that the employees Franulic had asked the court to consider as comparables for purposes of the fourth prong of her prima facie case (that is, David Church, Kevin Brown, Kenneth Ciesielski, and Frank Blaney) were not similarly-situated to Franulic.

■ In making this determination, the district court relied upon *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796 (6th Cir.1994), a reverse discrimination action where the male plaintiff who was demoted from his supervisory position for violating the company's sexual harassment policy had claimed that he was disciplined more severely than a female employee who had engaged in conduct even more flagrant than his. The *Pierce* court stated that in order to show that he was "similarly situated" to the female employee, "Pierce was required to prove that all of the relevant aspects of his employment situation were 'nearly identical' to those of [the female's] employment situation." *Pierce*, 40 F.3d at 802 (quoting *Ruth v. Children's Medical Center*, 940 F.2d 662 (Table), 1991 WL 151158, at * 6 (6th Cir. Aug.8, 1991)).

*Pierce* was a disciplinary termination case. A case more on point is *Ercegovich, supra*, where the district court had granted summary judgment for the employer of a plaintiff who claimed that, because of his age, his employer had *both* eliminated his position *and* refused to offer him a trans-

fer to other positions for which he was qualified. In *Ercegovich,* a panel of this Court pointed to *Pierce* for the proposition that a comparison is not required "in every single aspect of [the comparables' and plaintiff's] employment." 154 F.3d at 352. The *Ercegovich* Court explained that, under both *Pierce* and *Mitchell,* "[t]he plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated;' rather, as this court has held in *Pierce,* the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects.'" *Id.* at 352 and n. 3 (citing *Pierce,* 40 F.3d at 802) (emphasis added by the *Ercegovich* court to the quotation from *Pierce* ) (and citing several unpublished cases applying the *Pierce* decision to disciplinary terminations).

The district court here compared Franulic to the others as follows:

> Plaintiffs place great emphasis on the fact that Franulic was responsible for the Consumers Energy account that generated $300,000.00 a year, while David Church, Kenneth Ciesielski, Kevin Brown and Frank Blaney were not responsible for an account that generated comparable advertising revenues. Rather than supporting Franulic's gender discrimination claims, this evidence demonstrates that the relevant aspects of Church's, Ciesielski's, Brown's and Blaney's employment were not nearly identical to Franulic's job responsibilities as an Account Supervisor, and that Franulic was therefore not similarly situated with these individuals. *See Pierce,* 40 F.3d at 801. Church's primary responsibility as the MPD Director of New Business was strategic planning directed at generating new advertising accounts, not managing existing accounts.

Plaintiffs have not disputed that Church's Shop Vac account represented only ten percent of Church's overall responsibilities. Ciesielski administered the Air Touch/Cellular One account, an account characterized by Chris Elliott as "so labor intensive that we felt we needed to keep him." In contrast, Franulic testified that, at times, sixty to one-hundred percent of her work day was spent working on *pro bono* accounts unrelated to her Consumers Energy account. There is no evidence in the record tending to show that Kevin Brown's responsibilities, as Senior Partner, Media, involved generating advertising account revenues. Blaney's Senior Partner Pro Bono position, by definition, was not expected to generate income for Bozell.

Turning for a moment to the Consumer's [sic] Energy account, the $300,000.00 per year attributed to Franulic was actually a fixed fee payable to Bozell for a year, analogous to a retainer. The account generated $300,000.00 per year whether or not Franulic performed any further services for Consumers Energy, and whether or not Franulic herself occupied the position of Consumer Energy Account Supervisor. In contrast, the positions occupied by Church, Ciesielski, Brown and Blaney did not involve providing "on-call" services to a particular advertising client. Once Franulic was discharged, her position was eliminated, and the Consumers Energy account was assigned to Church in addition to his strategic planning responsibilities as the MPD Director of New Business. The evidence construed in a light most favorable to the plaintiffs demonstrates beyond dispute that Franulic was not similarly situated with Church, Ciesielski, Brown and Blaney. *Pierce,* 40 F.3d at 801. Franulic's man-

agement of an advertising account that automatically billed $300,000.00 a year does not establish that Franulic was more "productive" on October 16, 1997 than the other Managers within the MPD, particularly those whose primarily [sic] responsibilities did not include supervising profit-making accounts.

(J.A. at 403–04).

The business organization chart for Bozell, dated October 9, 1997, just days before Franulic was selected for termination, shows Kevin Brown as "Sr. Partner, Multi–Products, Media," with supervisory duties over Church, Blaney, Franulic and others.[15] (J.A. at 48). Because of his supervisory duties, Brown's value as a comparable to Franulic is virtually nil.

However, the district court's decision that the other employees were not similarly-situated to Franulic entailed impermissible factual determinations. Church, Blaney and Franulic all are depicted on the chart as peers.[16] In order to differentiate their positions, the district court concentrated almost exclusively on whether, in the *court's* view, these individuals managed customer accounts, apparently so as to decide whether they met the "performance and profitability" criteria which Bozell claimed it had used to decide which employees to RIF.

The district court said that the $300,000.00 annual income from Franulic's account had no significance because Bozell would earn that whether or not Franulic was there. In effect, the district court said that *her* profitability (in the amount of $300,000.00) did not *count.*

In contrast, the district court said that it was perfectly acceptable that Blaney earned *no* money (i.e., had *zero* profitability) because he was handling only *pro bono* accounts which were "not expected to generate income for Bozell." (J.A. at 404).

This logic strikes us as strange. Both Franulic and Blaney were *assigned* their particular accounts by the managing partner, Rob Elliott. Franulic lost her job because a contracted amount of $300,000.00 earned annually on her assigned account was not deemed to be "profitable," whereas Blaney kept his job despite his *zero* profitability in handling his assigned accounts *and* despite Elliott's knowledge that Blaney was fast-approaching retirement. (Blaney did, in fact, retire a few months later.) Also, as of January 1996, Blaney's annual salary was $96,000, whereas Franulic's salary at termination was only $69,000.

If "productivity" (that is, the ability to create profit for Bozell) had really been the determining factor, a reasonable jury might have found that Bozell could have RIF'd Blaney, who had only recent experience in account management, and reassigned his duties to Franulic, who was helping him with his pro bono accounts anyway, thereby still getting the $300,000.00 from the Consumers Energy account as well as coverage for its pro bono accounts, all for $27,000 less.

To further illustrate that the district court impermissibly made fact-findings and drew inferences from those facts, we point to the following (taking Church as an example): Bozell asserts that Church was

---

**15.** According to the chart, Brown, who was in charge of Media, shared supervisory responsibilities with Chris Elliott, who was a senior partner in charge of Creative. Apparently they both supervised all the same people but only in their respective area of expertise, that is, either Media or Creative.

**16.** Church is identified as "Director of New Business, Non–Chrysler Accts." Blaney has the description of "Senior Partner, Pro-Bono." Franulic is described as "Partner, Consumers Energy."

not an account manager but, rather, Director of New Business. The district court stated: "Church's primary responsibility as the ... Director of New Business was strategic planning directed at generating new advertising accounts, not managing existing accounts. Plaintiffs have not disputed that Church's Shop Vac account represented only ten percent of Church's overall responsibilities." (J.A. at 403). However, in Bozell's motion for summary judgment filed in the district court, Bozell indicated that Church himself estimated that he spent "[f]rom October 6, 1997 when he started until the end of December, 1997, ... approximately thirty to forty percent of his time on account management responsibilities and the rest on new business activities." (J.A. at 28, n. 3). Therefore, whether Church was truly an account manager is a fact in dispute.

Franulic also claims that she had long requested to be appointed to the vacant Director of New Business position, but that she was rebuffed, even though Rob Elliott admitted he never even looked at her credentials to see if she would be qualified. After Elliott came to Bozell in 1997, he brought with him people he knew from his previous employment. One of these persons was Church, who received the New Business position even though he lacked the required qualifications of solid agency experience and account experience.

■ Besides challenging the district court's determination that she had not established her prima facie case, Franulic also argues that the court below made impermissible factual findings when it determined that she had failed to establish that the criteria articulated by Bozell as reasons for selecting her for the RIF, to wit: performance, profitability and hard-

ship, were a pretext for gender discrimination.

On that score, the district court concluded:

> To any extent the plaintiffs may have raised a reasonable dispute regarding the true reasons for Bozell's decision to retain Church, Ciesielski, Brown and Blaney, this alone does not support a finding that Bozell's true motivator for discharging Franulic was gender discrimination.... Plaintiffs bore the burden of producing evidence that the explanation is false *and that* gender discrimination was the real reason. *Hicks,* 509 U.S. at 507–508, 516, 113 S.Ct. 2742.

(J.A. at 406–07). The district court also rejected Franulic's "limited" statistical evidence, concluding that it did not constitute "requisite additional evidence of gender discrimination." (J.A. at 408).[17]

As with the prima facie case, we hold that the district court made factual determinations and did not view the evidence in Plaintiff's (i.e., the non-movant's) favor. For example, using Church again, although he was selected as Director of New Business (which had the effect of insulating him from the RIF), he actually was not qualified for the position and was, in fact, removed from the position some time after Franulic's termination because of the *lack of new business,* something which senior partner Chris Elliott, who headed the Creative department, attributed to Church's lack of "deep contacts as a seasoned New Business person would [possess] ...." (J.A. at 329). Church was also removed from his position of account supervisor for CE (which he had assumed when Franulic was fired) after CE's Director of Marketing complained about Church's constant inability to meet dead-

---

17. The district court, properly in our view, rejected any argument that the "court skit" which occurred a year before the RIF was any evidence of discrimination.

lines and to keep CE informed of the status of projects. Although Church made $125,000 annually, he never made partner at Bozell, a status which Franulic *already* held at the time of her termination.

Of course, these facts, do not prove that discrimination, as opposed to favoritism or mere friendship between Rob Elliott and Church, was a motivating factor for Franulic's termination. However, if the inferences are properly drawn in favor of Franulic, a reasonable jury could find that the above facts suggest pretext. Although Church was removed as Director of New Business and as CE's account supervisor *after* Franulic's termination, these facts at the very least tend to suggest that when Franulic was chosen for the RIF instead of Church, *something* else was at work besides business decisions.[18] Since Church's selection appears to have been an *obviously* poor business decision that cannot otherwise be explained, Franulic should have been given the opportunity to present her case for pretext to a jury.

We conclude that, in granting summary judgment for Bozell, the district court impermissibly made factual determinations and drew inferences that should have been made by a jury.

## CONCLUSION

Because we hold that Franulic presented sufficient evidence from which a reasonable jury could infer that Bozell terminated Franulic's employment due to sex discrimination, we REVERSE the district court's granting of summary judgment to Bozell and REMAND for further proceedings consistent with this opinion.

---

**18.** Also, Church was offered the position of Director of New Business by letter dated September 18, 1997, a mere day before the President of Bozell's parent company ordered a hiring freeze. This timing looks suspicious and can be interpreted in a couple ways: either that Elliott was trying to get Church on board (because he actually had already gotten wind of both a hiring freeze and a RIF) so that he would already be in place when the RIF decisions were made; or, as a mere coincidence. These are matters for a factfinder.