**Arthur MCDANIEL, Plaintiff–Appellant,**

v.

**WAL–MART STORES, INC., Defendant–Appellee.**

No. 00–3753.

United States Court of Appeals, Sixth Circuit.

March 29, 2002.

Before KENNEDY, MOORE, and COLE, Circuit Judges.

## OPINION

MOORE, Circuit Judge.

Plaintiff–Appellant Arthur McDaniel appeals the district court's decision granting summary judgment to Defendant–Appellee Wal–Mart Stores, Inc. ("Wal–Mart"). McDaniel alleges that Wal–Mart terminated his employment on the basis of his race, in violation of Title VII and the Ohio Civil Rights Act. The district court concluded that McDaniel failed to show a prima facie case of intentional discrimination, because he could not show that a similarly situated employee received more favorable treatment. Alternatively, the court concluded that McDaniel had not presented sufficient evidence to create a jury question as to whether Wal–Mart's proffered reason for his discharge was a pretext for discrimination. For the reasons stated below, we AFFIRM the decision of the district court.

## I.

Plaintiff–Appellant, Arthur McDaniel, challenges his termination from the employ of Defendant–Appellee Wal–Mart. Wal–Mart hired McDaniel as an in-store loss prevention officer, which involved detecting and apprehending shoplifters, in December of 1998. McDaniel's hiring was approved by James Ailes, Wal–Mart's supervisor for loss prevention in the Akron/Canton area.

Upon beginning his employment, McDaniel underwent training designed to familiarize him with Wal–Mart policies and procedures regarding in-store loss prevention. This training lasted approximately two weeks. McDaniel acknowledges being informed during this training that Wal–Mart policy prohibited pursuing suspects off Wal–Mart property and engaging in

vehicle pursuits of suspected shoplifters. At the conclusion of this training, McDaniel signed and initialed a number of forms indicating his understanding of Wal–Mart's loss prevention policies. One of these forms, entitled "In–Store Loss Prevention Responsibilities," stated that he understood that failure to follow Wal–Mart loss-prevention policies is "grounds for termination." Joint Appendix ("J.A.") at 172. That form contained the following statements, written in all capital letters and underlined: *"NO CHASING OF SUSPECTS BEYOND WAL–MART PROPERTY. NO VEHICLE PURSUITS."* J.A. at 172. McDaniel, who has extensive experience in loss prevention work, acknowledged that a policy against vehicle pursuits was "the general rule in retail," and was motivated by a concern for the safety of store employees and innocent bystanders. J.A. at 70–71. (McDaniel Dep. at 87–88).

The first several months of McDaniel's employment were without incident. McDaniel received a favorable evaluation from Ailes at his ninety-day review. In April, Ailes asked McDaniel to work with a fellow loss prevention employee, Brenda Mills, to help her to improve her surveillance skills.

McDaniel was working with Mills on April 20, 1999, the day on which the events leading to McDaniel's termination occurred. On that day, McDaniel and Mills observed an individual place a portable compact disc player under his coat and exit the store. Once the suspect exited the store, McDaniel identified himself as a store security officer. The suspect ran to a red pickup truck in the parking lot. McDaniel ran after the suspect, and was able to grab hold of him as he reached the truck. According to McDaniel's deposition testimony, the suspect then pulled him onto the bed of the pickup truck.[1] At this point, the suspect's accomplice drove the vehicle out of the parking lot, with McDaniel and the suspect wrestling and fighting each other in the back.

James Jester, a loss prevention officer assigned to patrol Wal–Mart's parking lot, followed the truck in a "Parking Lot Patrol" vehicle (PLP), owned by Wal–Mart. Mills, joined by a store manager, also followed the suspects in a separate vehicle.

In his deposition, McDaniel stated that the truck drove away from Wal–Mart at a high rate of speed, suggesting at one point that it was traveling at fifty miles per hour. The truck drove to the parking lot of a Goodwill Store, where it stopped. At that point, McDaniel stated that he saw the PLP driving up the road at a "pretty good rate of speed" with its yellow light flashing. J.A. at 96 (McDaniel Dep. at 120). McDaniel called out to Jester to block the vehicle, but Jester was frozen at the wheel and did not move. McDaniel then jumped from the back of the truck, and the suspects "peeled rubber off the lot." J.A. at 97 (McDaniel Dep. at 121).

McDaniel then instructed Jester to move over, and McDaniel climbed into the driver's seat of the PLP. McDaniel stated that he decided to continue the pursuit in order to get the truck's license plate number. McDaniel told Jester to get out of the vehicle and wait for help in the parking lot, but Jester refused.

Driving the Wal–Mart PLP, McDaniel aggressively pursued the suspects. According to McDaniel's deposition testimony, he chased the truck, driving at "approximately between 35 and 45 miles an

---

1. This version of the facts differs somewhat from the statement McDaniel gave to the police, where he stated that the suspect "dove into the back of the truck. I also dove at approx, the same time...." J.A. at 276 (Police Statement at 1).

hour." J.A. at 101 (McDaniel Dep. at 125). During the chase, McDaniel collided with the truck twice. McDaniel admitted to running a light that was "turning red" during the course of the pursuit. At one point, the chase caused a van to drive off the road. The driver of the van called Wal–Mart and reported that he was forced off the road by a Wal–Mart vehicle. McDaniel testified, however, that it was the suspects' truck, and not the PLP, that forced the van off the road.[2] McDaniel stated that the suspects' truck drove recklessly in response to his pursuit, at times driving on the wrong side of the road. The chase eventually took the vehicles into a residential subdivision, where one of the suspects threw a tire at McDaniel from the bed of the truck. This maneuver finally caused McDaniel to lose the suspects.

At the conclusion of these events. Ailes interviewed Jester, Mills, and McDaniel, who recounted their recollections of the events. According to Ailes, Jester and Mills stated that they followed the truck out of a concern for McDaniel's safety. Ailes concluded that McDaniel had violated Wal–Mart policy for apprehending shoplifters, and that he should be terminated. After conferring with his regional manager, Ailes informed McDaniel that he was fired. McDaniel's exit interview form listed the reason for termination as "[p]lacing store associates, himself and the general public in danger." J.A. at 214 (Exit Interview Form). A "Coaching For Improvement Form" filled out the same day stated "[b]ecause of Arthur's decision to go into the bed of the truck and to continue pursuit after getting out of the truck, Arthur

placed himself, James Jester (PLP) and the general public in danger of serious injury. Arthur also placed Wal–Mart in a liability situation due to his actions and decisions." J.A. at 215.

On November 12, 1999, McDaniel filed suit against Wal–Mart, alleging that his termination was racially motivated in violation of Title VII of the Civil Rights Act of 1964 and the Ohio Civil Rights Act. The district court granted Wal–Mart's motion for summary judgment, concluding that McDaniel failed to present a prima facie case of racial discrimination because he could not show that he was treated less favorably than other similarly situated employees. For the same reason, the court found that McDaniel could not show that Wal–Mart's proffered nondiscriminatory reason for terminating him was a pretext for discrimination. McDaniel filed a timely notice of appeal.

II.

A.

A decision granting summary judgment is reviewed de novo. *See General Elec. Co. v. G. Siempelkamp GmbH & Co.,* 29 F.3d 1095, 1097 (6th Cir.1994). Summary judgment is proper only if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c). This court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The proper

---

2. Jester provided a somewhat more harrowing version of the facts in his deposition. According to Jester, McDaniel was driving about fifteen miles per hour over the speed limit, ran two red lights, and cut off two cars. J.A. at 163, 281. Jester also testified that McDaniel intentionally rammed the suspects'

truck. J.A. at 164 ("He said he was going to ram the truck."). In addition, Jester stated that it was McDaniel, not the suspects' truck, that forced the van off the road "[b]ecause we were on the wrong side of the road overtaking another vehicle going the same direction we were." J.A. at 167.

inquiry is whether the evidence is such that a reasonable jury could return a verdict for the plaintiff. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476–80 (6th Cir.1989). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1985). In conducting the summary judgment analysis, this court must view all inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party. *See General Elec. Co.*, 29 F.3d at 1097–98.

## B.

McDaniel asserts that his termination was racially motivated in violation of Title VII of the Civil Rights Act of 1964. Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(a)(1). "[A] plaintiff may establish discrimination either by introducing direct evidence of discrimination or by proving inferential and circumstantial evidence which would support an inference of discrimination." *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348 (6th Cir.1997). When seeking to establish a claim of discrimination under Title VII based upon circumstantial evidence, the plaintiff must make the showing described in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817,

36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

The *McDonnell Douglas/Burdine* framework consists of a three-stage inquiry:

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Burdine*, 450 U.S. at 252–53 (quoting *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817) (internal citation omitted). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 253, 101 S.Ct. 1089. The district court found that McDaniel failed to establish his prima facie case of discrimination. The court further concluded that even if it assumed, arguendo, that McDaniel had made his prima facie showing, he had not advanced sufficient proof that Wal–Mart's asserted nondiscriminatory reason for his termination – his reckless decision to pursue the shoplifting suspects off Wal–Mart's property and engage in a high speed vehicle chase – was a pretext for discrimination. McDaniel appeals both findings.

In order to state a prima facie case of employment discrimination based upon a racially motivated termination or disciplin-

ary action, the plaintiff must show: "(1) he was a member of a protected class; (2) that he suffered an adverse employment action; (3) that he was qualified for the position; and (4) that a person outside the protected class was treated more favorably than him." *Braithwaite v. Timken Co.,* 258 F.3d 488, 493 (6th Cir.2001). The district court concluded that although McDaniel satisfied the first three elements of his prima facie case, he failed to show that he had been treated differently than similarly situated employees outside the protected class. We will assume for the purposes of this appeal that McDaniel has met his prima facie case and focus our analysis on Wal–Mart's asserted nondiscriminatory reason for firing McDaniel and McDaniel's evidence of pretext.[3]

■ Under the *McDonnell Douglas/Burdine* burden-shifting framework, once the plaintiff establishes a prima facie case of intentional discrimination, the burden shifts to the defendant to articulate a nondiscriminatory reason for its actions. The defendant only bears the burden of production; the burden of persuasion remains with the plaintiff at all times. *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. In the instant case, Wal–Mart claims that it terminated McDaniel because he violated company policy and endangered the public and his co-workers by pursuing the suspects off Wal–Mart's property and engaging in a vehicle chase. It is conceded that this is a legitimate nondiscriminatory reason for terminating an employee. In order

to prevail, therefore, McDaniel must show that this reason was "a pretext for discrimination." *Burdine,* 450 U.S. at 252–53, 101 S.Ct. 1089.

In order to show that Wal–Mart's asserted reason is pretextual, McDaniel must show either "(1) that the proffered reasons had no basis *in fact,* (2) that the proffered reasons did not *actually* motivate his discharge, or (3) that they were *insufficient* to motivate discharge." *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1084 (6th Cir.1994) (quotation omitted). The first type of showing consists of evidence that the facts asserted by the employer simply did not happen. Under the second manner of showing pretext, the plaintiff generally concedes that the asserted conduct could motivate his discharge, but "argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id.* The third means of showing pretext, that the proffered reason was insufficient, ordinarily involves "evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Id.; see also McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817 ("Especially relevant to such a showing [of pretext] would be evidence that white employees involved in acts

---

**3.** We believe that this approach is most consistent with the principles articulated in our decision in *Cline v. Catholic Diocese of Toledo,* 206 F.3d 651, 665 (6th Cir.2000), which held that the employer's proffered reason for termination should not be considered when assessing the plaintiff's qualifications at the prima facie stage. To do otherwise, we explained, would frustrate the goal of providing the plaintiff "a full and fair opportunity to demonstrate pretext." *Id.* (quoting *Burdine,*

450 U.S. at 255–56, 101 S.Ct. 1089). For the same reasons relied upon in *Cline,* Wal–Mart's reasons for treating McDaniel differently than other employees who may have been involved in the relevant events is best considered in the context of pretext, so that McDaniel may have a full opportunity to contest whether the reasons given by Wal–Mart were the actual reasons motivating the adverse employment actions.

against the petitioner of comparable seriousness ... were nevertheless retained or rehired."). "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated," although such a showing might not *always* be adequate to sustain a jury's finding of liability." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

■ In the instant case, McDaniel does not dispute that he engaged in the conduct cited by Wal–Mart as its reason for discharging him. The primary evidence advanced by McDaniel to show pretext is the fact that Jester and Mills, both white, who McDaniel asserts were engaged in conduct of comparable seriousness, were not disciplined for their actions on April 20, 1999. McDaniel's claims that Jester and Mills received more favorable treatment also make up the core of his circumstantial case. We proceed therefore to consider whether this evidence is sufficient to create a genuine issue of material fact as to the ultimate question of discrimination.

In order to show that a similarly situated employee received disparate treatment for the same conduct, "the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects.'" *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir.1998) (quoting *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 802 (6th Cir.1994)). Exact correlation between the plaintiff and the proffered similarly situated employee is not required. *See id.* In cases asserting discriminatory disciplinary action, it is necessary to show that the asserted similarly situated non-minority employees "engaged in misconduct of 'comparable seriousness.'" *Harrison v. Metropolitan Gov't of Nashville,* 80 F.3d 1107, 1115 (6th Cir.), *cert. denied,* 519 U.S. 863, 117 S.Ct. 169, 136 L.Ed.2d 111 (1996) (citation omitted) (finding comparable seriousness where other employees, like the plaintiff, all had multiple motor vehicle accidents during same time period in addition to other violations, but other employees had been disciplined separately for each offense, whereas plaintiff's infractions were considered cumulatively); *accord Perry v. McGinnis,* 209 F.3d 597, 601 (6th Cir.2000) (finding prima facie case of differential discipline where plaintiff showed other employees who were not disciplined admitted to making exactly the same errors – primarily typographical and paperwork mistakes – as those for which the plaintiff was disciplined). "'[P]recise equivalence in culpability between employees' is not required." *Harrison,* 80 F.3d at 1115 (quoting *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 283 n. 11, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976)).

In the instant case, the employees asserted to be similarly situated to McDaniel, James Jester and Brenda Mills, engaged in conduct that was significantly less culpable than the conduct of McDaniel. McDaniel argues that both employees violated company policy by leaving Wal–Mart property without authorization. However, the relevant question is whether the actions of Jester or Mills, even if they violated company policy, were roughly equivalent in culpability to the actions of McDaniel.

McDaniel asserts that Jester engaged in comparably culpable conduct by driving the PLP vehicle off Wal–Mart property when he followed the suspects' truck from the Wal–Mart parking lot to the Goodwill store. McDaniel implies that Jester must have been speeding in order to follow the suspects' truck to the Goodwill parking lot.

However, McDaniel did not claim to see Jester's PLP engaging in any dangerous maneuvers. There is no evidence that Jester violated any traffic laws or endangered any bystanders. Moreover, there is no indication from the record that Ailes, the relevant decision maker, was informed of any facts suggesting that Jester drove the PLP in a dangerous manner. By his own admission, in contrast, after exiting the truck at the Goodwill store, McDaniel pursued the suspects in a Wal–Mart vehicle at speeds ranging from thirty-five to forty-five miles per hour, collided with the suspects' truck twice, caused the suspects to drive in a highly reckless manner which in turn forced an innocent motorist off the road, drove through a traffic light that was "turning red," and continued the vehicle chase through a residential subdivision.

McDaniel contends that his behavior in engaging in a dangerous vehicle pursuit cannot be a basis for distinguishing his own conduct from the conduct of Jester because Jester was an active participant in the vehicle chase. According to McDaniel, Jester refused McDaniel's suggestion that he get out of the PLP and encouraged the pursuit when he told McDaniel "no way, buddy, I'm with you. I'm with you all the way." J.A. at 101 (McDaniel Dep. at 125). McDaniel also notes that Jester did not instruct him to cease the pursuit, and that jester aided in the pursuit by recording the license plate number of the truck.

McDaniel's argument is unavailing. We note that there is a significant difference between controlling a vehicle in a dangerous manner and riding along as a passenger. The decision to run through a traffic light turning red and to ram another vehicle was made by McDaniel the driver, not Jester the passenger. We recognize, however, that this fact alone may not be enough to distinguish Jester. If it were shown, for example, that Jester offered his assistance in order to encourage McDaniel to give chase to the suspects, we think Jester could be considered partly culpable for the hazardous pursuit that ensued.

Wal–Mart contends that the facts do not show such encouragement. Instead, Wal–Mart asserts that the undisputed facts show that Ailes honestly and reasonably believed after investigating the events of the day that Jester's decision to accompany McDaniel was motivated solely by Jester's concern for McDaniel's safety, not his own enthusiasm for the chase. *See Braithwaite*, 258 F.3d at 494 ("If there is no material dispute that the employer made a reasonably informed and considered decision that demonstrates an honest belief in the proffered reason for the adverse employment action, the case should be dismissed since no reasonable juror could find that the employer's adverse employment action was pretextual." (quotation omitted)). Ailes's deposition indicates that the only reason for Jester's actions provided on the day of the chase was that Jester was concerned about McDaniel's safety and hoped to bring McDaniel back to the store. J.A. at 241 (Ailes Dep. at 94) ("All I know is what Jim told me and that the only reason he left the parking lot was to attempt to, to get Mack and bring him back to the store."). McDaniel has pointed to no facts known to Ailes which would demonstrate that Jester encouraged McDaniel's behavior. Nowhere in the record is it suggested that Ailes was told about Jester's "I'm with you all the way" comment, or his assistance in writing down the license plate number. In his deposition, McDaniel confirmed that the reason expressed by Jester at the time for his refusal to get out of the PLP was that he feared for McDaniel's safety should McDaniel attempt to engage the two shoplifters in another confrontation alone. J.A. at 101 (McDaniel Dep. at 125) ("I stopped at that light, and I said, Jim you need to

get out, call the store, let them know where I'm at, that I'm safe and that I'm gone. He said, well, what if you get into an altercation with these two guys, again you will be alone."). Although Jester admits he did not protest McDaniel's actions, Jester's deposition testimony suggests that the explanation was that McDaniel had already made up his mind to pursue. J.A. at 251 (Jester Dep. at 16) ("Well, no. I didn't protest. Because he had already started out into Arlington Street.").

In the absence of any facts suggesting that Ailes believed that Jester was encouraging McDaniel's actions, rather than merely being unwilling to leave McDaniel to face the danger alone, McDaniel has not established that Jester's participation in the chase was comparably culpable to his own behavior in driving the automobile. McDaniel, as the one behind the wheel, was the one to decide how closely to follow the truck, at what speed he would drive, whether to ram the truck, and whether to drive through a traffic light that was turning red. None of the facts alleged by McDaniel demonstrates that Jester encouraged, or otherwise participated in, any of these decisions. Although Jester did record the truck's license plate number, McDaniel admits that he instructed him to do so. The fact that Jester rode along in the PLP, demonstrated a willingness to do what he could to ensure McDaniel's safety, and complied with McDaniel's requests for assistance, without more, does not show that Jester engaged in comparably culpable conduct to that of McDaniel.

Moreover, McDaniel has alleged no evidence concerning the activities of Mills beyond the fact that she left Wal–Mart property in search of McDaniel. There is no indication on the record that she engaged in any hazardous activity. It is undisputed that Mills was accompanied by a store manager, which strongly implies that she had authorization to leave the premises.

McDaniel also asserts that Patrick Wyrick, a Caucasian, "had performed an act similar to the one which had caused Appellant's discharge on a previous occasion" and was not fired. Appellant's Br. at 32. The incident in question involved Wyrick's failure to investigate fully a suspected shoplifting incident, which resulted in a shoplifter being permitted to leave the store with a stolen item. This incident is not one of comparable seriousness. The proffered reason for McDaniel's termination was that his conduct exposed the public and coworkers to danger and exposed Wal–Mart to liability, not that he failed to apprehend a suspect. The Wyrick incident did not involve any danger to public safety and is therefore sufficiently distinguishable.

McDaniel also argues that Wal–Mart condoned an off-property apprehension he made once before. J.A. at 212 (McDaniel Aff.). The fact that the plaintiff himself was treated more favorably on a prior occasion, however, does not support an inference of discrimination. Moreover, this apprehension did not involve a vehicle chase.

In sum, we conclude that McDaniel has not alleged facts sufficient to show a genuine issue of material fact as to pretext. We therefore affirm the decision of the district court granting summary judgment to the Defendant Wal–Mart.

### C.

The same result obtains for McDaniel's claims under the Ohio Civil Rights Act. *See* OHIO REV.CODE ANN. § 4112 (Banks–Baldwin West 2001). "Ohio courts utilize the same *McDonnell Douglas* analysis [employed by federal courts for Title VII claims] when analyzing discrimination

claims brought under the Ohio Civil Rights Act." *Cline,* 206 F.3d at 668; *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n,* 66 Ohio St.2d 192, 421 N.E.2d 128, 131 (1981) (stating that *McDonnell Douglas* framework is the "starting point for judicial inquiry" into state law discrimination claims). Therefore, summary judgment is warranted on McDaniel's state law claims for the reasons discussed above in connection with his Title VII claims.

### III.

For the foregoing reasons, we AFFIRM the decision of the district court.