Nicole BROMLEY, Plaintiff–Appellant,

v.

PARISIAN, INC., an Alabama Corporation d/b/a Younkers Defendant–Appellee.

No. 01–1874.

United States Court of Appeals, Sixth Circuit.

Dec. 20, 2002.

Before BATCHELDER, COLE, and GIBBONS, Circuit Judges.

OPINION

COLE, Circuit Judge.

Plaintiff–Appellant Nicole Bromley appeals the district court's grant of Defendant–Appellee Parisian Inc.'s motion for summary judgment. Bromley was an employee of Parisian, Inc. d/b/a/ Younkers (hereinafter "Younkers"). Bromley brought a diversity action under 28 U.S.C. § 1332, asserting that she was wrongfully discharged in violation of Michigan's Elliot–Larsen Civil Rights Act ("ELCRA") and the Whistleblowers' Protection Act ("WPA"). The district court dismissed Bromley's WPA claim for failure to show any causal connection between her complaint and her discharge. The district court granted Younkers' motion for summary judgment with regard to the ELCRA claim, finding that Bromley failed to establish a prima facie case.

Bromley now appeals from the grant of summary judgment on the ELCRA claim. Bromley does not appeal the district court's dismissal of her WPA claim. Bromley asserts two issues for review: (1) whether the district court erred in finding that she did not engage in activity protected under ELCRA; and (2) whether the district court improperly weighed evidence and resolved genuine issues of material fact in determining that she could not demonstrate a causal connection between her allegedly protected activity and her termination.

For the reasons that follow, we AFFIRM the judgment of the district court.

I.  BACKGROUND

Nicole Bromley was employed by Younkers as a management trainer from April 15, 1998, until October 18, 1999. Originally, she worked out of a Younkers office in Milwaukee, Wisconsin. While there, Bromley was told in a disciplinary interview that she needed to improve her work conduct in several respects in order to maintain employment with the company. In October of 1998, at her request, Bromley was transferred to a Younkers store in Grandville, Michigan.

During Bromley's tenure at the Michigan store, significant problems arose with regard to the job satisfaction of two particular employees, George Styes and Amy Stack–Richey. Styes and Stack–Richey are the two employees on whose behalf Bromley was allegedly opposing discriminatory activity. Bromley asserts that Styes was a victim of weight discrimination and Stack–Richey a victim of sexual harassment. Bromley claims that her termination was in retaliation for her opposition to the discrimination these two individuals encountered.

In May of 1999, the Grandville store sought to hire a dock manager. Styes

interviewed for the position. According to Bromley, Kathleen Donahue, an assistant store manager, expressed concern over hiring Styes for the position because of his weight. Bromley asserts that Donahue stated, "Well, he's a very fat man and we don't have anyone else applying for the job, but I have doubts about hiring such a large man to work in the dock." Bromley states that her response to Donahue was, "If that's the only reason you're not considering hiring him, don't even think about it. You cannot not hire somebody because of their weight." Styes was hired for the position.

Bromley asserts that she witnessed numerous discriminatory remarks about Styes's weight. In June, Dan Montgomery, the store manager, allegedly told Bromley that "you could tell by looking at him that he knows where to eat." In August, Bromley overheard Montgomery comment that Styes "isn't built for this. He sweats like a fat pig and gets nothing accomplished." Lastly, in September, Bromley claims to have overheard Montgomery saying that the SlimFast beverage in the company refrigerator must belong to Styes.

In September, 1999, just before Styes's first scheduled performance evaluation, Montgomery reportedly told Styes that he would be unlikely to remain with the company unless he did a "100% turn around." On September 10, Bromley e-mailed her supervisor, Jodi Gruening, to inform her that Styes was very concerned about losing his job. Gruening responded by telling Bromley, "This is between George [Styes] and Dan [Montgomery]. You do not need to be involved more than a listening ear as a friend. If he has performance issues, then Dan is well within his boundaries to part company within George's 90 days." This same morning, Bromley sent another e-mail to Gruening, stating, "George [Styes] also wasn't allowed to have his picture taken with the group picture ....... and he also did not receive a floor tile like the other managers that was engraved ..... Yet he was the first one on board.... Just FYI .... (pretty sad huh)." (Ellipses in original).

On September 14, just a few days after the exchange of these e-mails and the conversation in which Montgomery informed Styes that he needed to turn his performance around, Styes resigned his position. Styes expressed to Bromley his frustration with the poor treatment he felt he received as an employee of Younkers. Styes stated in an e-mail, "I feel I have been discriminated against due to the simple fact that Dan Montgomery does not like me." Bromley forwarded this message to her supervisor, Gruening, prefacing the message with the statement that "I believe he is talking Law Suit here.... Should anyone be concerned ... ? ? ? I believe he feels its [sic] a weight issue as well as far as not being in the picture!!!" (Ellipses in original).

Gruening responded with an e-mail saying, "I don't see anything about weight or a law suit in George's TAO [e-mail]. Did he SAY that to you?" Bromley replied, "The weight thing was mentioned before ...... Just that what concerns me is when he said discrimination.... We covered that kind of thing in Diversity ...... He did not SAY law suit ... just want you to know we talked about the weight thing before...." (Ellipses in original). Bromley alleges that "on or about September 14," the day that Styes resigned, she "suggested that Mr. Styes seek legal counsel regarding the discriminatory treatment he received."

Bromley also contends that Stack–Richey, also employed at the Grandville store, approached her with a number of complaints about her employment, including

sexual harassment by a co-worker. Bromley states that she passed this information along so that the company would be aware of it. The record is silent, however, as to whom and in what manner this information was conveyed.

On October 5, 1999, Bromley was scheduled to train Mary Jo Christiansen, the store's new assistant manager for human resources. On that same day, Montgomery had meetings with Stack–Richey and another employee regarding problems with their performance. According to Montgomery, he was directed by his supervisor to have someone from the human resources department sit in on the meeting. While Bromley was training Christiansen that day, Donahue "came in and said 'I need to see Mary Jo right now. We need her for two write-ups, and you are not to talk to either person after the write-ups.'"

After her counseling session, Stack–Richey arrived at Bromley's office in tears asking to speak with her right away. Stack–Richey complained to Bromley about the way Montgomery handled the session. Soon thereafter, Montgomery "barged in" to Bromley's office and told Stack–Richey to get back to work. After a heated exchange between Bromley and Montgomery, Bromley alleges that Montgomery told her to leave the premises.

Bromley then called Gruening. After hearing about the confrontation with Montgomery, Gruening suggested that Bromley leave the store as Montgomery had requested, and they would discuss the matter later. Gruening later told Bromley that she should not go back to the store until Younkers had reviewed the incident in detail.

On October 7, 1999, Bromley sent a long e-mail to Gruening. In response to the criticism that she was getting involved in employee complaints that were outside the scope of her duties as a trainer, Bromley wrote to Gruening, "I believe that the first time I got you involved because of an associate was George. Until then it was all about my relationship with him [Montgomery] and Kathleen. What happened to George was unthinkable and illegal. Yet there were 2 sides." She went on to say, "then Amy comes to me . . . Then Scott . . . Then Kim . . . then Denice . . . I searched out no one." (Ellipses in original).

On October 18, 1999, Human Resources Director Karla Severson and Gruening met with Bromley and informed Bromley of her termination.

## II. ANALYSIS

### A. Standard of Review

This Court reviews de novo a district court's grant of summary judgment. *See Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 409 (6th Cir.1999). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When reviewing a motion for summary judgment, the evidence, all facts, and any inferences that may be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam)). However, a "mere scintilla" of evidence is not sufficient; the evidence must be such that a reasonable jury could find in favor of the plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B.   Applicable Law

Michigan's ELCRA provides, in pertinent part:

An employer shall not do any of the following:

(a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.

(b) Limit, segregate, or classify an employee or applicant for employment in a way that deprives or tends to deprive the employee or applicant of an employment opportunity, or otherwise adversely affects the status of an employee or applicant because of religion, race, color, national origin, age, sex, height, weight, or marital status.

Mich. Comp. Laws § 37.2202(1) (2002). The act's retaliation provision further provides, in pertinent part:

Two or more persons shall not conspire to, or a person shall not:

Retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act.

Id. § 37.2701(a).   In order to establish a prima facie claim for wrongful retaliation under ELCRA, a plaintiff must show:

(1) that the plaintiff engaged in a protected activity,

(2) that this was known by the defendant,

(3) that the defendant took an employment action adverse to the plaintiff,

(4) that there was a causal connection between the protected activity and the adverse employment action.

*Meyer v. City of Center Line*, 242 Mich. App. 560, 568–69, 619 N.W.2d 182 (2000).

If the plaintiff is able to establish this prima facie case, then the burden shifts to the defendant to produce evidence that a nondiscriminatory reason existed for the adverse employment action. *See Reisman v. Regents of Wayne St. Univ.*, 188 Mich. App. 526, 539, 470 N.W.2d 678 (1991) (per curiam).   If the defendant is able to demonstrate such a rationale, the plaintiff must then be afforded an opportunity to show that the reasons offered were a pretext for discrimination. *See id.*   Notably, Michigan courts have found federal precedent interpreting Title VII to be "highly persuasive."   *See Meyer*, 242 Mich.App. at 569, 619 N.W.2d 182; *see also Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1311–12 (6th Cir.1989) (stating that "Michigan courts clearly look to Title VII in resolving questions arising under Elliot–Larsen").

### C.   Protected Activity

Bromley does not claim that she "made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act."   MCL § 37.3701(a).   Thus, in order to have a retaliation claim under ELCRA, she must have engaged in activity "opposing a violation" of the act.   *Id.*

In order to qualify as opposition activity, the actions of the plaintiff need not formally invoke the protection of ELCRA.   *See McLemore v. Detroit Receiving Hosp.*, 196 Mich.App. 391, 396, 493 N.W.2d 441 (1992); *see also Barrett v. Kirtland Cmty. Coll.*, 245 Mich.App. 306, 318–19, 628 N.W.2d 63 (2001) (noting that employees do not have to "specifically cite" ELCRA to be protected).   If an adverse employment decision

"is a result of that employee raising the spectre of a discrimination complaint, retaliation prohibited by the act occurs." *McLemore,* 196 Mich.App. at 396, 493 N.W.2d 441. Nevertheless, the employee "must do more than generally assert unfair treatment." *Barrett,* 245 Mich.App. at 319, 628 N.W.2d 63. Indeed, "[t]he employee's charge must clearly convey to an objective employer that the employee is raising the specter of a claim of unlawful discrimination." *Id.* (citation omitted).

We find that there are two incidents that lend support to the claim that Bromley engaged in opposition activity. First, when the company was interviewing for the position of dock manager, Bromley told Donahue that they "cannot not" hire Styes because of his weight. Second, Bromley stated in an e-mail to Gruening that "[w]hat happened to George was unthinkable and illegal." A reasonable jury could find that these particular acts do raise the specter of discrimination, and therefore qualify as opposition activity.

We are mindful that an employee "must do more than generally assert unfair treatment." *Barrett,* 245 Mich.App. at 319, 628 N.W.2d 63. Bromley's statements to Donahue that she "cannot not hire". Styes because of his weight, and "If you are not going to hire him because of his weight, don't even think about doing that because that's weight discrimination," could be viewed as statements which do more than generally assert unfair treatment. These statements could reasonably be viewed as opposing illegal activity, and, as such, these statements are appropriately left to interpretation by the trier of fact.

We note that there is evidence in the record indicating that Donahue was in a position to influence whether Styes was given the dock manager job. Donahue allegedly claimed that she had "doubts about hiring such a large man to work in the dock," and Bromley stated to Donahue that *Donahue* could not refuse to hire Styes based on his weight. This exchange only makes sense if it is understood that Donahue had a decision-making role regarding hiring for the position.

We also deem irrelevant, as a basis for finding that Bromley did not engage in protected activity, that Donahue simply expressed doubt about hiring Styes because of his weight, and that the company hired Styes for the position. Expressing this doubt about hiring Styes based on his weight may in fact be "discriminating against an individual because of weight," M.C.L. § § 37.2202(1)(a), or "[l]imit[ing] an applicant for employment in a way that tends to deprive the applicant of an employment opportunity." MCL § 37.2202(1)(b). Moreover, to be protected by ELCRA, Bromley need not be opposing an *actual* violation, but rather, her belief that the opposed practices are unlawful must only be reasonable. *See Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 579 (6th Cir.2000) ("an employee is protected against employer retaliation for opposing any practice that the employee reasonably believes to be a violation"). Additionally, when Bromley made this statement to Donahue, the decision to hire Styes had not yet been made. Thus, the fact that Styes was eventually hired has no impact on whether Bromley could have reasonably believed that she was opposing unlawful activity when she made the statement in question. Surely, if Donahue had said, "I think we should probably only hire white people to work at this store," Bromley would not have had to wait until all of the employees hired turned out to actually be white before she could engage in opposition activity protected by ELCRA.

Similarly, when Bromley asserted to Gruening that "what happened to George was ... illegal," her claim that Younkers'

conduct was illegal asserted more than mere unfair treatment by their employer, and it would properly be within the province of the jury to determine whether this actually was opposition activity. In commenting on the illegality of the manner in which Younkers treated Styes, Bromley surely did much more than provide a general "heads up" that Styes may believe that he had been discriminated against. On the contrary, this October 7, 1999 e-mail did not reflect Bromley's view that Styes believed himself to be the victim of illegal discrimination. Rather, it clearly asserted that Bromley herself believed that the conduct of the company was illegal. If "raising the specter of discrimination" is sufficient, under Michigan law, to invoke the protection of ELCRA, explicitly asserting the presence of illegality, a fortiori, must certainly be protected as well. The September 14, 1999 e-mail exchange between Gruening and Bromley is not relevant to this analysis. There, it may fairly be said that Bromley was merely giving her employer a "heads up" about what another employee might be thinking.

Thus, we find that the district court erred in holding that Bromley failed to raise a genuine issue of material fact as to the first element of the prima facie case, whether she engaged in protected activity.

### D. Causation

Regardless of whether Bromley's conduct was protected activity, there is no evidence that raises a genuine issue of material fact with regard to the fourth prong of the prima facie case, namely, that there was a causal connection between the protected activity and the adverse employment action. As such, because Bromley is unable to satisfy the causation element, we find that Bromley was unable to satisfy her burden of establishing a prima facie case.

To demonstrate causation, "the plaintiff must show that his participation in activity protected by [ELCRA] was a 'significant factor' in the employer's adverse employment action, not just that there was a causal link between the two." *Barrett*, 245 Mich.App. at 316, 628 N.W.2d 63; *accord Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.* 176 F.3d 921, 929 (6th Cir.1999). "In order to show a causal connection, a plaintiff must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Allen*, 165 F.3d at 413. A causal link can be shown by one of two methods: (1) direct evidence; or (2) knowledge coupled with a closeness in time that creates an inference of causation. *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir.2000) (citing *Parnell v. West*, 1997 WL 271751, *2 (6th Cir.1997)).

(1) *Whether Bromley presented sufficient direct evidence to demonstrate causation*

Bromley argues that the direct evidence of the causal link between the protected activity and Bromley's dismissal comes from the deposition testimony of two of the three individuals identified as being responsible for making the decision to terminate her employment. One, the vice president of human resources, Mark Barkley, stated that Bromley "would ferret out unsolicited things, stir up problems and then not report them to the appropriate people." Appellant argues that Barkley's statement could be read to relate to Bromley's concerns about the discriminatory treatment of Styes and Stack–Richey.

Bromley also contends that direct evidence of causation can be found in Severson's statement that the reason she chose to part company with Bromley was "a lot

of TAO's [e-mails] that were communicated back and forth during this time period between Nikki not being in the Grandville store and us looking into what happened."

Neither of these statements qualifies as direct evidence. First, the statement by Barkley needs to be read in full context. It is clear from the deposition transcript that Barkley was not complaining about Bromley's comments regarding alleged discriminatory treatment. Rather, he was very explicitly disapproving of Bromley's overall habits of interacting with employees, causing problems where none existed, and trying to solve problems that were well outside the scope of her job description. In fact, contrary to Bromley's contention that she was fired for opposing discrimination, Barkley stated that part of the problem is that she *was not* reporting incidents that needed to be reported. There is no genuine issue of material fact present here that would allow a reasonable juror to conclude that Barkley's remarks were in reference to Bromley's concerns about illegal discrimination.

With regard to the Severson testimony, again Bromley skews the facts. Severson refers to Bromley's e-mails not because one contains a statement about Styes, but rather, because her e-mails were generally combative, inappropriate, and irrational, and because they triggered Severson to more extensively review Bromley's work performance. Thus, it is again clear that this testimony could not reasonably be construed to present direct evidence that Younkers terminated Bromley because she was opposing illegal discrimination.

(2) *Whether Bromley's evidence was sufficient to create an inference of causation*

Since Bromley presents no reasonable direct evidence of causation, in order to prevail she must be able to present cir-

cumstantial evidence creating a genuine issue of material fact regarding whether her opposition activity was a significant factor in her dismissal. However, no such circumstantial evidence exists.

The statement made to Donahue about basing the hiring decision on Styes's weight cannot create a reasonable inference of causation because there is no evidence that any of the individuals involved in the decision to terminate Bromley ever knew that this comment was made. Thus, Bromley's entire argument rests on the hope that there exists a genuine issue of material fact regarding whether the line in her e-mail to Gruening, which states that "what happened to George was unthinkable and illegal," was not only opposition activity, but also a significant factor in the decision to terminate her. Contrary to Bromley's contention, no such genuine issue exists.

Bromley relies heavily on the timing of her dismissal in support of the argument that the necessary causal link can be found. It is true that the e-mail in question came only eleven days before her termination. "However, temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence." *Nguyen,* 229 F.3d at 566. As applied to Bromley, the timing of the termination has less evidentiary value than it may have in the majority of cases because this e-mail also was sent *after* Bromley had the confrontation with Montgomery that eventually led to the decision to terminate her.

Recognizing this, Bromley argues that the district court failed to consider her other evidence in connection with the timing of her dismissal. This other evidence consists of the alleged inconsistency among the rationales given by Severson, Barkley, and Gruening to explain the decision to terminate Bromley. This argument is un-

persuasive. To the extent that Severson, Barkley, and Gruening each performed different functions within the organization and varied in the degree to which they interacted with Bromley, it is to be expected that they would have somewhat varied explanations of the problems with her performance. With that in mind, it is with relative consistency that they describe the problems that Bromley posed. The totality of the comments made by these three individuals is exactly what one would expect from supervisors displeased with an employee for conducting herself in the manner that Bromley did. No reasonable juror could find that these explanations constituted indirect evidence of discrimination.

Lastly, Bromley suggests that a causal connection can be inferred by the combination of the timing and the disparate manner in which the company treated Bromley and Montgomery. Indeed, this Court has held that "[t]he causal connection between the adverse employment action and the protected activity ... may be established by demonstrating that the adverse action was taken shortly after plaintiff filed the complaint and by showing that he was treated differently from other employees." *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir.1999). However, in order for the disparate treatment of two employees to give rise to an inference of retaliatory motive, the employees must be similarly situated, which means that all relevant aspects of their employment need to be nearly identical. *See Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir.1994). Because Bromley and Montgomery were not similarly situated, in terms of their role in the company as well as their performance history, an infer-

ence cannot be drawn from the fact that they were treated differently.

In sum, Bromley simply does not provide sufficient evidence to reasonably support an inference that the decision by Younkers to terminate her was in retaliation for her involvement in opposition activity under ELCRA. As such, she is unable to satisfy the requirements of a prima facie case, and the decision by the district court to grant summary judgment in favor of Younkers was appropriate.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

ALICE M. BATCHELDER, Circuit Judge, concurring.

BATCHELDER, Circuit Judge.

Although I concur with the result reached in Judge Cole's opinion, I write separately because I would not have found the plaintiff established a prima facie case. In particular, Bromley's statement to Donahue that the company "cannot not" hire Styes because of his weight was made–as far as the record reveals–only to Donahue, who was not in a position to make the hiring decision, and who, as I read this record, apparently did not know what hiring decision was going to be made.[1] In fact, Donahue simply expressed a "doubt" about hiring Styes because of his weight, as Judge Cole correctly related in the statement of facts; whether anyone in a decision-making position even knew of Donahue's "doubts" cannot be determined from the record; and in any event, when Bromley explained that weight could not be a hiring factor, the company had not refused to hire Styes–on account of his weight or for any

---

1. Although Bromley referred to the collective "you" when paraphrasing her discussions with Donahue regarding the hiring of Styes, Dan Montgomery, the store manager, stated in his deposition that he was the one who hired Styes and he did not recall discussing Styes' weight with Donahue.

other reason–and subsequently did in fact hire him, suggesting management (if Bromley's comments reached those making the hiring decision) followed her advice and did not react in a hostile manner towards Bromley. Applying Judge Cole's very clear analysis of what the plaintiff has to show to make out a prima facie case, I would say Bromley has fallen way short with regard to this statement. It is not only what someone might interpret the statement as meaning that counts here, but whether the statement was made in a context that reasonably could be viewed as expressing opposition to conduct that violates or would violate the act. There was not any such conduct, or even the threat of such conduct, since the record does not reflect that anyone with the power to influence the decision-making was contemplating refusing to hire Styes because of his weight.

The "unthinkable and illegal" incident is, in my view, as clear an example of an employee's general assertion of unfair treatment as we are going to find. The spectre of a claim of unlawful discrimination, it seems to me, must mean something more than a general "heads up" to the employer that the employee thinks another employee might be thinking he was discriminated against. *See Mitan v. Neiman Marcus*, 240 Mich.App. 679, 613 N.W.2d 415, 416–17 (holding complaints amounting to generic claims of "job discrimination" did not qualify as a charge made under the Persons with Disabilities Act. M.C.L. § 37.1101 *et seq.); see also Barrett v. Kirtland Community College*, 245 Mich.App. 306, 628 N.W.2d 63, 72 (stating that an "an employee must do more than generally assert unfair treatment"). Even if we include in this incident the September 14 e-mails (in which Bromley opined to her supervisor that she thought Styes might be "talking Law Suit here," but admitted that he had never mentioned a law suit and further advised that she "just wanted you to know we talked about the weight thing") this correspondence would not clearly convey to an objective employer that Bromley was raising the spectre of a claim of unlawful discrimination. Indeed, the facts make it clear that Bromley's supervisor attempted to determine exactly what Bromley's point was, since Styes himself had not mentioned either his weight or a law suit, and Bromley did not respond that she was objecting to the company's discriminating against Styes because of his weight. She simply said she "just want[ed] you to know...." Again, I think Bromley falls well short of presenting enough to make the prima facie case. Accordingly, although I would not reach the issue of causation, I concur in the result.