JOURNAL ENTRY AND OPINION.
 I. {¶ 1} Plaintiff-appellant James Petro appeals the trial court's grant of a directed verdict in favor of defendant-appellee, Cuyahoga County Board of Commissioners ("Cuyahoga County" or "the county") on Petro's claim of reverse race discrimination. Petro, a white male, brought a claim of (reverse) race discrimination against the county after he was passed over for promotions in favor of black females. Here, he argues that the court improperly granted the directed verdict before the close of evidence and that the court based its decision on evidence not in the record.
 II. A. {¶ 2} Petro worked for Cuyahoga County starting August 1987 as "clerk-1" in the Human Services Department. Four months later he was promoted to the "clerk-2" position. In January 1989, he was promoted to work as a case worker under the supervision of Lorraine Smith. In June 1994, he was promoted to the C.U.R.E. Unit as a "case controller," where he reviewed welfare cases. He claims that his career began to stall in December 1998 when Linda Reed and then Cynthia Sharp, both black females, became his immediate supervisors. Previous to this time, he had had four black female supervisors. In March 1999, another black female, Carolyn Martin, became Petro's immediate supervisor.
 {¶ 3} During the time in question, Petro applied for and was denied 57 jobs. Roughly 65% of these positions were filled by minorities. He was finally promoted (out of the C.U.R.E. Unit) two weeks after he filed this lawsuit (July 2001). Petro had applied for positions all over the county. Petro alleges that the neighborhood service centers throughout the county were staffed according to the racial makeup of the local community. Further, at the time of trial, every one of the case controllers in his former unit were black females.
 {¶ 4} Petro argues that he was denied jobs and was mistreated because of racial discrimination. Details of Petro's allegations will be discussed below.
 B. {¶ 5} At the close of Petro's case, the county moved for a directed verdict. The trial court took arguments from both parties and immediately rendered its decision. The court directed the verdict in favor of the county, finding that Petro had failed to carry his burden in making a prima facie case of race discrimination.
 III. {¶ 6} Under two assignments of error, Petro argues that the trial court abused its discretion in granting appellee's motion for a directed verdict prior to the close of evidence and by basing its decision on testimony and facts that were not in evidence. Finally, he argues further that the directed verdict was improper since he had made a prima facie case of race discrimination.
 {¶ 7} "A motion for directed verdict or JNOV must be granted if `the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party.' Civ.R. 50(A)(4); Nickell v. Gonzalez (1985), 17 Ohio St.3d 136, 137,477 N.E.2d 1145. The court does not engage in a weighing of the evidence or evaluate the credibility of the witnesses; rather, the issue is solely a question of law — did the plaintiff present sufficient material evidence at trial on a claim for relief to create a factual question for the jury? Malone v. Courtyard By Marriott (1996), 74 Ohio St.3d 440,445, 659 N.E.2d 1242. Appellate review of a motion for directed verdict or JNOV is de novo. Whitaker v. Kear (1997), 123 Ohio App.3d 413, 422,704 N.E.2d 317; Howell v. Dayton Power Light Co. (1995),102 Ohio App.3d 6, 13, 656 N.E.2d 957." Olive v. Columbia/HCA HealthcareCorp. (Mar. 9, 2000), Cuyahoga App. Nos. 75249 and 76349.
 {¶ 8} Here, the question is whether Petro made a prima facie case of race discrimination. We hold that he did not.
 A. 1. {¶ 9} Petro alleges that, upon his return from leave in 1999 (via the Family Medical Leave Act and vacation), he was subjected to unfair treatment from his black female supervisors. He alleges that he was denied job opportunities by the county and that he was generally mistreated because of his race.
 2. {¶ 10} To make a prima facie showing of reverse race discrimination here, Petro must show: (1) background circumstances supporting the inference that the county was the unusual employer who discriminated against white employees; (2) that he was not hired for positions obtained by black employees; (3) that he was qualified for the positions obtained by black employees; and (4) that the county's non-hiring of Petro enabled the county to hire black people. Ekstrom v.Cuyahoga Community College (2002), 150 Ohio App.3d 169, 179.
 {¶ 11} This test differs slightly from the test required of minority plaintiffs, who must show, in addition to the last three elements listed above, that they are members of a statutorily protected class. See Carney v. Cleveland Heights-University Heights City SchoolDist. (2001), 143 Ohio App.3d 415, 428.
 {¶ 12} In his brief to this court, Petro argues the latter race discrimination test applies because he, although a white male, was a minority in the C.U.R.E. Unit. As stated by Petro, "In December of 1999, shortly after Carolyn Martin became his supervisor, there were four African-American and four Caucasian Case Control Reviewers under her supervision. * * * By August 2000, however, [Petro] was the only Caucasian Case Control Reviewer in the unit supervised by Carolyn Martin[.]" Petro concludes that this is not a reverse discrimination suit and that he need only show disparate treatment, not any background circumstances supporting the inference that the county was the unusual employer who discriminated against white employees.
 {¶ 13} The county disagrees, arguing that "while otherwise unexplained acts may give rise to an inference of discrimination when experienced by a member of a historically disfavored group, such an inference is not necessarily justified when the plaintiff is a member of a historically favored group."
 {¶ 14} The Ohio Supreme Court has not reached the issue whether a non-minority must show "background circumstances." The Sixth Circuit has. It applied the "background circumstances" element in Murray v.Thistledown Racing Club, Inc. (C.A.6 1985), 770 F.2d 63. It has since noted, however, that such a requirement puts an extra burden on non-minorities not required of minorities. Pierce v. Commonwealth LifeIns. Co. (C.A.6 1994), 40 F.3d 796. There, the court stated that "we have serious misgivings about the soundness of a test which imposes a more onerous standard for plaintiffs who are White or male than for their non-White or female counterparts." Id. at 801, fn. 7. The Pierce court, however, did not overturn its earlier pronouncement on the issue since the plaintiff had failed other prongs of the test.
 {¶ 15} We too have "serious misgivings about the soundness of a test" that, by requiring different burdens depending on the group to which one belongs, violates the very equal protection that anti-discrimination statutes were meant to ensure. We are nonetheless bound by precedent to apply the reverse discrimination test. See Ekstrom
and Carney. And, irrespective of whether Petro was a "minority" he must still show that he was discriminated against because of his race.
 {¶ 16} This he has not done.
 3. {¶ 17} At most, Petro has shown that he and his immediate supervisors did not get along. He has not shown, at the least, that Cuyahoga County is the rare employer that discriminates against non-minorities. Petro shows that minorities were hired in greater numbers than non-minorities, but offers no evidence that such hiring was the result of discrimination. We therefore hold that the trial court properly directed the verdict in favor of the county.
 {¶ 18} Petro alleges that he was passed over for 57 job openings. As the trial court pointed out, only three of those openings were handled by the supervisors he complains of. In fact, one of the positions for which he applied was given to Cynthia Sharp, one of the supervisors. Sharp was given the job by George Hrbek, a white male. Further, for example, the county showed that Petro did not fill out the questionnaire required for the application for other jobs ultimately secured by Martin and Linda Bonner, who did submit answers to the questionnaire.
 {¶ 19} Some of the other successful applicants who were chosen over Petro did have fewer qualifications, but they were white. Defense counsel also got Petro to admit that some of the black applicants had significant experience in the fields of the positions for which they were ultimately selected.
 {¶ 20} He also argues that the county had a practice of hiring people who matched the racial composition of the neighborhood where the office was located. Petro does show that more blacks work on the eastside and that more whites work on the westside. But he does not offer any evidence that this result was reached through racial discrimination.
 {¶ 21} Further, Petro alleges that he was not allowed to continue working his four-day work week (10 hours a day). Evidence shows, however, that, when he returned from his leave, the office policy had changed to disallow the four-day work week. There is evidence that some may have been allowed to continue to work four days a week. Petro testified that Linda Reed may have been working a four-day work week and that Jim Bichl was certainly working a four-day work week. Reed is a black female; Bichl, however, is a white male.
 {¶ 22} Petro further argues that he was denied overtime opportunities. Evidence also shows that Petro did work overtime and that other non-minorities were allowed to work overtime. Petro claims that he was denied an opportunity to work as much overtime as the county allows. That may be true, but he does not show that this denial was the result of racial bias.
 {¶ 23} Petro also argues that he was written up for dress code violations while others were not. Evidence showed that supervisors had dealt with other dress code violators, including minorities, in ways similar to that of Petro.
 {¶ 24} Petro also finds discrimination in the piling up of boxes around his desk. In fact, as Petro admitted, the boxes were placed in the unoccupied cubicle in front of his. They were removed within a matter of weeks. He claims that they were not removed until he filed a complaint, but he testified that the boxes were stacked in July or August of 1999 and that his first complaint was not filed until November or December of 1999.
 {¶ 25} Petro also complains that a minority was selected over him to attend a conference. Evidence shows that the minority in question was allowed to go because she had not attended a conference in the last two years and that Petro had.
 {¶ 26} Petro complains that his work was nitpicked. Petro himself testified that Cynthia Sharp and Carolyn Martin expected more detailed work (specifically, verification of benefit calculations) than his prior supervisors had required.
 {¶ 27} One final example. Petro complains that he was required to stay after work for almost half an hour while his computer was being repaired. He complains that he did not immediately receive comp time. He did, however, ultimately receive the comp time.
 {¶ 28} Assuming that all of these examples constitute adverse treatment (most do not), Petro was able to offer no evidence that showed that any of this treatment was due to racial bias. In fact, on cross-examination, Petro admitted that he was the only one in his department who was mistreated by Carolyn Martin and Cynthia Sharp and that he was not aware of any other white males in that unit who Sharp mistreated. And, as the trial court pointed out, there was no evidence offered by Petro that anyone observed him being singled out or treated differently because he was white.
 4. {¶ 29} In sum, Petro has not been able to show that Cuyahoga County is the unusual employer who discriminates against non-minorities. He therefore has not carried his burden of making a prima facie case of race discrimination.
 B. {¶ 30} We now discuss whether the trial court's references to matters not introduced into evidence at trial constitutes reversible error. Because Petro failed to carry his burden with the evidence he did present at trial, we hold that such references do not constitute reversible error.
 1. {¶ 31} First, we point out that the trial court did not make its ruling on the county's motion for directed verdict before the close of evidence. The court asked counsel if there were any more witnesses. Petro's counsel answered no.
 {¶ 32} A party may move for a directed verdict "on the opening statement of the opponent, at the close of the opponent's evidence or at the close of all the evidence." Civ.R. 50(A)(1). Here, the county properly moved for a directed verdict at the close of Petro's evidence. There is nothing in the record to suggest that Petro sought to introduce any further evidence.
 2. {¶ 33} Next, we address whether the trial court, in rendering its decision on the county's motion, improperly considered evidence outside of that presented at trial. As Petro points out, a trial court "shall sustain the motion and direct a verdict for the moving party" when the trial court, "after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusionupon the evidence submitted and that conclusion is adverse to such party[.]" Civ.R. 50(A)(4) (emphasis added). The rule clearly requires the trial court to make a decision based "upon the evidence submitted[.]"
 {¶ 34} Here, the trial court did make reference to "evidence" that was not submitted at trial.[1] Specifically, the court referred to (1) the statement by a white supervisor who believed that Petro did not deserve an interview for one of the positions; (2) that the city of Cleveland is roughly 65% black, 35% white; (3) Cynthia Sharp's deposition, when she did not testify at all at trial; and (4) the parties pretrial briefs. We hold that such references were harmless because ultimately Petro failed to carry his burden.
 3. {¶ 35} The question therefore is whether any of these references constituted reversible error. We hold that they do not. The burden of persuasion is on Petro. The court suggested correctly that, even if he disregarded the "evidence" to which he initially referred, Petro had failed to carry his burden.
 {¶ 36} The court's references to the legal authority in the parties' pretrial briefs is the least troubling. The court is required to apply the correct law to the facts. That the court referenced law as found in a party's pretrial brief does not render that law inapplicable. The court explained that it read the briefs to understand the issues before the court. (It should be noted that the judge who heard the trial and who directed the verdict was not the original trial judge and so did not rule on any of the pretrial motions.)
 {¶ 37} Further, the trial court referred to Petro's pretrial brief, in which Petro argued that he was the victim of discrimination. The court then explained to Petro that he had not carried his burden. Had the trial court not read his pretrial brief, the trial court would nonetheless have had to decide whether Petro carried his burden.
 {¶ 38} Further, the reference to the white supervisor who recommended against granting Petro an interview does not affect the analysis considering that, of the 57 positions for which Petro applied, only three of the decisions were made by the supervisors about whom Petro complains. And other testimony shows that not one person can point to a specific instance when he was mistreated because of his race.
 {¶ 39} The reference to Cynthia Sharp's deposition testimony is irrelevant. A co-worker testified at trial that Sharp admitted to being a racist and that she had to work on it. The trial court made reference to Sharp's deposition testimony, in which she explained her comment. Her testimony was not offered into evidence. Her explanation is ultimately unimportant because her statement, that she was a racist, was not shown to be relevant to any of Petro's specific claims. In other words, that Sharp is or is not a racist does not show that she acted in a discriminatory manner with respect to Petro. Petro has not shown that she did.
 {¶ 40} Finally, the court's reference to the racial makeup of the city of Cleveland is, if anything, harmless error. Even if the court did improperly use his own information in reaching its decision, the fact of the matter remains that Petro has failed to make a prima facie showing of race discrimination.
 IV. {¶ 41} Therefore, we hold that Petro has failed to carry his burden and that the trial court's reference to matters not in evidence was harmless error. We affirm.
PATRICIA A. BLACKMON, J., and ANNE L. KILBANE, J., CONCUR.
[1] Petro argues that the trial court came to court on the second day of trial with a typewritten, prepared document. He argues that the trial court had its mind made up before the second day of trial. There is no evidence in the record of this, other than the fact that the court referred to evidence other than that submitted at trial. The question here, however, is whether such references were improper here.