JOURNAL ENTRY and OPINION
{¶ 1} Plaintiff Thomas Partlow, Jr. brought this handicap discrimination and wrongful discharge action after his employer, Blue Coral-Slick 50[1] ("Blue Coral") discharged him for failing to abide by the terms of a return to work agreement. At the time, Partlow had been participating in Blue Coral's employee assistance program for depression and drug addiction. Blue Coral discovered that Partlow had violated the terms of the return to work agreement and terminated him. The court granted Blue Coral's motion for summary judgment on all counts and this appeal followed.
 {¶ 2} As with all cases on appeal from summary judgments, we construe the evidence in a light most favorable to the non-moving party. See Civ.R. 56(C).
 {¶ 3} Partlow had worked at Blue Coral for a little over a year when in late February 2002, he approached Blue Coral's human resources representative and told her that he had a drinking problem. In conformity with Blue Coral's stated drug policy, the representative told him that the company's employee assistance program ("EAP") would be made available to him. The EAP gave Partlow the names of some counselors and during a session with one of the counselors he divulged that he had a cocaine addiction and depression. Partlow began receiving outpatient counseling and continued working at Blue Coral, but relapsed into drug use less than three weeks later. At that point, Blue Coral placed Partlow on medical leave as he was placed in a treatment facility.
 {¶ 4} At the beginning of April 2002, Partlow received permission to return to work. Blue Coral conditioned Partlow's continued employment on a "return to work agreement." That agreement, signed on April 2, 2002, contained the following conditions for "continued employment":
 {¶ 5} "1. Agree to successfully participate and complete the plan of treatment recommended by the EAP and/or Substance Abuse Professional (SAP) following my return to work.
 {¶ 6} "2. Agree to fully accept whatever aftercare counseling and treatment is prescribed by the EAP and/or SAP following my return to work.
 {¶ 7} "3. Agree that the Human Resources and/or other appropriate Company personnel will be provided information regarding my plan of treatment and will be apprised of my continued participation. I understand that this information may be communicated to management or safety personnel with a need to know; however, the Company will maintain this information confidentially to the extent possible.
 {¶ 8} "4. Agree to periodic unannounced drug and alcohol testing for a period not to exceed sixty months in addition to any other testing programs in place, which shall be administered solely at the Company's discretion. I understand that confirmed positive test result will result in termination of employment.
 {¶ 9} "5. Agree to abstain from the use of alcohol or any controlled substance as identified in the Company's Drug and Alcohol Policy.
 {¶ 10} "I understand that my failure to adhere to all terms of this agreement will be cause for termination of my employment and that I will not be eligible for re-hire."
 {¶ 11} Partlow returned to full time employment, but on April 19, 2002, had an incident with the police that led to his termination. Partlow said that he had driven to an apartment complex that was "a known drug place" and a location where he had purchased crack before. He admitted that his purpose in going there was to buy crack cocaine, although he had no money and was therefore hoping that someone would "give me some drugs." Generosity eluded him, however, and he said that he left empty-handed.
 {¶ 12} Unbeknownst to Partlow, police officers were observing the apartment building since it was a known drug trafficking area. They observed Partlow driving in the area and ran a license check on his vehicle. They learned his license had been suspended, so they stopped him. According to a police report, the officers saw Partlow making "furtive" gestures before stopping his car. When they approached him, the officers noticed that Partlow was chewing something. Partlow resisted attempts to retrieve what was in his mouth, so the officers applied a pepper spray. They found several small objects and applied a field test which gave positive results for cocaine. The field test also gave a positive result for cocaine in Partlow's "spit."
 {¶ 13} Partlow denied possessing any cocaine, and said that the substance in his mouth was acetaminophen with codeine. At his deposition and in an affidavit, Partlow said that he received a prescription for that medication from an oral surgeon approximately three years before his arrest.
 {¶ 14} Partlow missed work the next day (a Saturday) and on the following Monday, and Blue Coral issued him a written warning for an unexcused absence. Partlow admitted lying to the human resources representative by telling her that he had been arrested for traffic offenses when he had, in fact, been arrested on drug charges. He then recanted his story and told the human resources representative that he had been arrested for possession of cocaine.
 {¶ 15} Blue Coral contacted Partlow's drug treatment therapist and learned that Partlow had admitted during a therapy session that he relapsed into drug use. In light of this revelation, Blue Coral determined that Partlow had violated the terms of the return to work agreement and terminated his employment.
 {¶ 16} Blue Coral submitted an affidavit from a psychiatrist treating Partlow for depression. In a clinical note dated May 6, 2002, the psychiatrist stated that Partlow acknowledged having crack at the time of his arrest and trying to hide it from the police. Partlow apparently said that "he has not been using any drugs but he was holding his friend's cocaine."
 I {¶ 17} Partlow first argues that the court erred by granting Blue Coral's motion for summary judgment on his claim that the return to work agreement violated the Americans With Disabilities Act ("ADA"), Section 12101 et seq., Title 42, U.S. Code and R.C. Chapter 4112. He maintains that the return to work agreement unlawfully changed the terms and conditions of his employment solely because he was seeking treatment for his drug addiction and depression.
 {¶ 18} When addressing claims of discriminatory termination under the ADA, we interpret the Ohio handicap discrimination statutes by reference to federal law. Columbus Civ. Serv. Comm.v. McGlone, 82 Ohio St.3d 569, 573, 1998-Ohio-410,697 N.E.2d 204. Under the framework set forth in McDonnell Douglas Corp. v.Green (1973), 411 U.S. 792, 36 L.Ed.2d 668, 93 S.Ct. 1817, Partlow must first establish a prima facie case of discrimination by showing that he (1) has a disability within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) suffered an adverse employment action as a result of the disability. After Partlow has established each element of his prima facie case, Blue Coral must then rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for the adverse employment action. If Blue Coral is able to do this, the burden of production shifts back to Partlow to demonstrate that Blue Coral's non-discriminatory reason is pretextual.
 {¶ 19} For purposes of this appeal, we can assume without deciding that Partlow was able to make out a prima facie case of discrimination because we find that reasonable minds could only conclude that Partlow violated the terms of the last chance agreement, thus establishing a legitimate, non-discriminatory reason for discharge.
 {¶ 20} While current drug rehabilitation is considered a disability under law, current drug use is not. In CorrectionsCorp. of America v. Human Relations Comm. of City of Youngstown
(2000), 139 Ohio App.3d 58, 62, 742 N.E.2d 1177, the court of appeals stated:
 {¶ 21} "Both the ADA and the Rehabilitation Act prohibit covered employers from discriminating against individuals with disabilities. 42 U.S.C. Section 12112; 29 U.S.C. Section 794. Under both Acts, individuals engaging in current, illegal use of drugs are excluded from coverage. 42 U.S.C. Section 12114(a);29 U.S.C. Section 706(8)(c)(I). Each Act, however, contains a safe-harbor provision that affords coverage to an individual who:
 {¶ 22} "`(1) has successfully completed a supervised drug rehabilitation program and is no longer engaged in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use;
 {¶ 23} "`(2) is participating in a supervised rehabilitation program and is no longer engaging in such use; or
 {¶ 24} "`(3) is erroneously regarded as engaging in such use, but is not engaging in such use * * *.42 U.S.C. Section 12114(b), Title 42, U.S. Code; 29 U.S.C. Section 706(8)(C)(ii)."
 {¶ 25} Section 12114(b) goes on to provide that "it shall not be a violation of this Act for a covered entity to adopt or administer reasonable policies or procedures, including but not limited to drug testing, designed to ensure that an individual described in paragraph (1) or (2) is no longer engaging in the illegal use of drugs."
 {¶ 26} To this end, many employers have instituted return to work or "last chance agreements" with employees who seek to return to work following a period of rehabilitation. The courts have rather consistently found that such agreements are valid under the ADA.
 {¶ 27} For example, in Longen v. Waterous Company (C.A.8, 2003), 347 F.3d 685, the Eighth Circuit Court of Appeals rejected the argument that a "last chance agreement" subjected an employee to conditions that were different from those imposed on other employees. The last chance agreement required the employee to "abstain from using any mood altering chemicals, including alcohol" under penalty of "immediate termination."
 {¶ 28} Likewise, in Golsen-El v. Runyon (E.D.Pa. 1993),812 F.Supp. 558, the district court held that an alcoholic's violation of a last chance agreement did not constitute a discharge based solely on a disability. The court stated:
 {¶ 29} "Of course, the plaintiff would not be subject to the Last Chance Agreement but for her alcoholism. The plaintiff, however, was fired because she breached the Last Chance Agreement, not because she was an alcoholic. To attribute the firing to alcoholism is defective reasoning that skips the key step of reality, i.e., the prior accommodation to alcoholism by the Last Chance Agreement. Such defective reasoning would render Last Chance Agreements nugatory, because every breach could be attributed to a development connected to an alcoholic's problems. The Last Chance Agreement was a reasonable accommodation. Its lines were bright and strict. Plaintiff crossed those lines. In fairness to the employer and other alcoholics who will need Last Chance Agreements, I will not discourage their use by making their terms meaningless." Id. at 561 (footnote omitted). See, also, Fuller v. Frank (C.A.9, 1990), 916 F.2d 558; Mararri v.WCI Steel Inc., 130 F.3d 1180 (C.A.6, 1997); Lottinger v. ShellOil Co. (S.D.Tex. 2001), 143 F.Supp.2d 743.
 {¶ 30} Partlow argues that he did not sign the return to work agreement voluntarily and that he did so because of an ultimatum issued by Blue Coral — sign the return to work agreement or be terminated. This contention is belied by the wording of the agreement itself, in which Partlow stated that "I understand and agree to the following terms and conditions as a condition of my return to work and continued employment with the Company." InMcKey v. Occidental Chem. Corp. (S.D.Tex. 1997),956 F.Supp. 1313, 1319, an alcoholic employee returned to work after leave for alcohol treatment by signing a return to work agreement. His continued employment was conditioned on him signing the return to work agreement and, after breaching that agreement, the employee claimed that he did not sign the agreement voluntarily. The district court stated:
 {¶ 31} "The violation of Plaintiff's Return to Work Agreement constitutes misconduct sufficient to terminate his employment, even if that misconduct was related to his alcoholism. The Plaintiff voluntarily entered into the Return to Work Agreement, fully understanding its terms and conditions. The Court must strictly construe such Agreements. Thus, while the provisions of the Return to Work Agreement may seem severe, the Court's role is not to reinterpret them. Therefore, the Plaintiff must abide by the consequences of his Agreement."
 {¶ 32} The only Ohio case to consider the issue is DePalmav. City of Lima, 155 Ohio App.3d 81, 2003-Ohio-5451,799 N.E.2d 207. Unfortunately, we may not cite to the case as authority because the Ohio Supreme Court has ordered that the opinion "may not be cited as authority except by the parties inter se." Cityof Lima v. DePalma, 104 Ohio St.3d 1201, 2004-Ohio-6401,818 N.E.2d 1197.
 {¶ 33} The supreme court's order is odd given that the publication in the Ohio Official Reports of a court of appeals opinion carries with it an express designation by the Supreme Court Reporter. See Rule 3(B) of the Supreme Court Rules for the Reporting of Opinions. Moreover, we have significant doubt whether the Ohio Supreme Court may dismiss an appeal as "improvidently allowed" — a dismissal that very clearly does not reach the merits of the appeal — and then purport to limit the persuasive value of the merits of the case. By limiting the persuasive value of a case to the parties, the objective observer must conclude that the supreme court made a tacit judgment on the merits of the case, despite calling its disposition a "dismissal." If it truly did not consider the merits of the case, at least for purposes of giving a ruling on the merits of the appeal, it is difficult to understand how it can order that only the parties "inter se" may cite to the case.
 {¶ 34} As far as we can tell, the supreme court has engaged in this practice 26 times since first employing it in State v.First, Inc. (1999), 59 Ohio St.3d 603, 571 N.E.2d 436. We cannot, however, find any authority for the practice, which arguably constituted a sea change in procedure for the court. Up to that point, there is no indication that the supreme court had sought to limit in any way the precedential value of lower court opinions in cases that were dismissed as improvidently allowed.
 {¶ 35} At any rate, we are bound by the supreme court's order and cannot consider the case as authority for any proposition. In any event, we agree with those federal courts that have found that last change agreements or return to work agreements of the kind signed in this case do not violate the ADA.
 {¶ 36} Partlow also argues that he did not technically violate the terms of the return to work agreement because there was no proof that he had actually ingested drugs in violation of the agreement. He points to his deposition testimony in which he claimed that he intended to purchase drugs, but did not do so. While he admits that he, like any recovering substance abuser, has urges to ingest drugs, those urges alone cannot form the basis for finding a violation of the return to work agreement.
 {¶ 37} It is true that Partlow did testify that he did not ingest the drugs found in his car. This contradicted police evidence which showed traces of cocaine in his saliva at the time of arrest. Under Civ.R. 56, we construe this conflict of evidence in his favor.
 {¶ 38} It is also true that Partlow claimed to be in possession of acetaminophen with codeine that allegedly was purchased through a prescription from an oral surgeon. Blue Coral contradicted Partlow, by submitting an affidavit from the oral surgeon that stated that Partlow had not been a patient of the oral surgeon for the previous eight years nor had the oral surgeon prescribed medication for Partlow. Again, Civ.R. 56 requires us to construe the evidence most favorably to Partlow.
 {¶ 39} Nevertheless, there was other evidence which showed that Partlow admitted to using drugs after he signed the return to work agreement. At a group counseling session held just after his arrest on possession charges, Partlow told the group that he had "been in jail this weekend used."
 {¶ 40} Partlow tried to explain this statement in a narrative he submitted with a union grievance he filed as a result of the termination (the union did not pursue the grievance because it believed that "to take this grievance any further would not change the final response of the grievance procedure of your contract * * *."). In that narrative, he stated that he told the group "I had the thoughts of using" and went on to state that his desire to use drugs was not the same thing as actually using the drugs.
 {¶ 41} This narrative cannot, however, overcome Partlow's own admissions that he had no reason to doubt that he tested positive for cocaine on the night of arrest. Moreover, Partlow's psychiatrist wrote a note on May 6, 2002, detailing an emergency session he conducted with Partlow. The note states:
 {¶ 42} "Today, he came as an emergency because he claims that he was fired from his job last Friday. They fired him because he claims that he was driving his vehicle and was stopped by the police because he had some warrant for not paying fines for speeding. They found that he had a few flakes of cocaine in his car and he was also trying to hide on [sic.] rock of crack cocaine. He put the crack in his mouth and they were asking him to open his mouth and spit it out but he did not do it. They found that it was cocaine because it was in his saliva."
 {¶ 43} The note went on to recount how Partlow did not tell Blue Coral the real reason for his arrest, and that after attending a group therapy session he had a change of heart and told Blue Coral the truth and was terminated. The note states:
 {¶ 44} "Now, he is saying that he has not been using any drugs but he was holding his friends [sic.] cocaine. He has called the union people but he has not gotten any answer from them. He is thinking that he may need a lawyer to get his job back. He was pretty much wondering whether telling the truth wasa good idea or not." (Emphasis added.)
 {¶ 45} While evidentiary conflicts between witnesses in summary judgment proceedings must be resolved in favor of the non-moving party, evidentiary conflicts in the non-moving party's own statements are not subject to the same rule. Those kinds of conflict are not "genuine" in the sense contemplated by Civ.R. 56(C). See Cleveland Clinic Foundation v. Commerce GroupBenefits, Inc., Cuyahoga App. No. 79907, 2002-Ohio-1414. The court had no obligation to give Partlow the benefit of the doubt when he made statements to medical providers to the effect that he used drugs in violation of the terms of the return to work agreement.
 {¶ 46} Indeed, the courts normally credit the veracity of statements made to medical providers because it is assumed that a person seeking treatment will be truthful — the desire to be made better outweighs the potential for mendacity. See Staff Note to Evid.R. 803(4). That being the case, Partlow cannot openly contradict the substance of those statements by attempting to create fine distinctions between what he said and what he apparently meant to say. The psychiatrist's note states that Partlow openly wondered whether, in hindsight, he made a mistake by telling the truth. The only reasonable conclusion from this statement is that Partlow believed that he should not have admitted to drug use because that admission ultimately caused him to lose his job. We don't believe that anything Partlow has subsequently said to explain that statement to the psychiatrist casts the least bit of doubt on the veracity of that statement.
 {¶ 47} Even if there was some room for disputing these statements, the psychiatrist's note very clearly shows that Partlow admitted having crack cocaine in his mouth at the time the police stopped the car. Regardless whether he possessed the crack cocaine for his own purposes or was holding it for his friend, the presence of cocaine in his mouth, a fact that Partlow has not denied, would be sufficient to show that he violated the terms of the return to work agreement because he had not abstained from the use of a controlled substance.
 {¶ 48} Accordingly, we find that reasonable minds could come to but one conclusion on the evidence, that conclusion being that Partlow violated the terms of the return to work agreement by ingesting drugs. Blue Coral therefore set forth a legitimate reason for discharge. Partlow has offered nothing to show that his dismissal was a pretext for handicap discrimination, so we affirm the summary judgment on the ADA claim.
 II {¶ 49} Partlow also claimed that he had been the victim of racial discrimination. The only contested issue under this claim was whether Partlow proved disparate treatment (Blue Coral conceded that Partlow established his membership in the protected class, that Partlow was qualified for his position and that Partlow was subjected to an adverse employment action). Partlow claimed that the other employee had been found drunk at work, yet was allowed to enter rehab and resume work. He claims that he was discharged even though he did not report for work while under the influence of drugs.
 {¶ 50} An employee may show unlawful discrimination by proving disparate treatment of similarly situated employees. SeeSmith v. Wal-Mart Stores (C.A.5, 1990), 891 F.2d 1177, 1180. In this context, "similarly situated" means that an employee must be "directly comparable in all material respects." Sartor v.Spherion Corp. (C.A.7, 2004), 388 F.3d 275, 279 (internal quotation omitted); Pierce v. Commonwealth Life Ins. Co.
(C.A.6, 1994), 40 F.3d 796, 802. This requires the plaintiff to show not only that the employees reported to the same supervisor, engaged in the same conduct, and had the same qualifications, but also show that there were no "differentiating or mitigating circumstances as would distinguish * * * the employer's treatment of them." Radue v. Kimberly-Clark Corp. (C.A.7, 2000),219 F.3d 612, 617-618.
 {¶ 51} The court did not err by granting summary judgment on the racial discrimination claim because Partlow failed to show that the other employee was similarly situated with him. The other employee, a worker named Simon, was reported drunk on the job. Blue Coral terminated Simon, and he voluntarily went into rehab. After completing rehab, Blue Coral rehired him on the condition that he sign a return to work agreement. Simon continues as a Blue Coral employee, and the evidentiary materials show that he has not violated the terms of the return to work agreement.
 {¶ 52} We fail to see how Partlow can equate Blue Coral's treatment of Simon as being different from his treatment. Both employees went into rehab and both regained employment under the terms of a return to work agreement. They were treated identically by Blue Coral. The key difference is that Partlow violated the return to work agreement, while Simon did not.
 {¶ 53} Partlow erroneously believes that he was entitled to greater leeway since he did not violate Blue Coral's drug and alcohol policy. We cannot deny that there is no evidence that Partlow engaged in drug use while on the job. But that is not the point. Once he sought help from the EAP, his return to employment was voluntarily conditioned on abiding by the terms of the return to work agreement. Just like Simon, he agreed to conditions on further employment with Blue Coral. Unlike Simon, he breached those terms. The two employees were not similarly situated; thus, Partlow did not establish a prima facie case of race discrimination.
Judgment affirmed.
It is ordered that appellees recover of appellant their costs herein taxed.
The court finds there were reasonable grounds for this appeal. It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Dyke, P.J., and Rocco, J., Concur.
[1] It appears that Blue Coral-Slick 50 was purchased by Pennzoil-Quaker State Company in July 2003, after the events in question but before commencement of this action. For the sake of continuity, we shall refer to the defendant as Blue Coral.